# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *People v. Coleman*, 2013 IL 113307

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHRISTOPHER COLEMAN, Appellant. |
| Docket No. | 113307 |
| Filed | October 3, 2013 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A successive postconviction petitioner claiming actual innocence in that he was not present when a group of men invaded a home was awarded a new trial for armed robbery and aggravated criminal sexual assault after presenting new, material and noncumulative evidence challenging his identification—*Washington* standard adhered to. |
| Decision Under Review | Appeal from the Appellate Court for the Third District; heard in that court on appeal from the Circuit Court of Peoria County, the Hon. Michael E. Brandt, Judge, presiding. |
| Judgment | Judgments reversed.<br>Cause remanded. |

| Counsel on Appeal | Karen L. Daniel, of Chicago, and Kathryn Couey, Sharon Makowsky, Amber Montague and Lindsey Sieling, law students, for appellant. |
| | |
| | Lisa Madigan, Attorney General, of Springfield, and Jerry Brady, State's Attorney, of Peoria (Michael A. Scodro, Solicitor General, and Michael M. Glick and Eric M. Levin, Assistant Attorneys General, of Chicago, of counsel), for the People. |
| | |
| | Gary M. Elden, Pei Y. Chung, Paul A. Sheldon and Justin R. Donoho, of Grippo & Elden LLC, of Chicago, for *amici curiae* 40 Concerned Illinois Attorneys. |
| | |
| Justices | JUSTICE THEIS delivered the judgment of the court, with opinion. |
| | Chief Justice Kilbride and Justices Freeman, Thomas, Garman, Karmeier, and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    The central issue in this appeal is whether the circuit court of Peoria County's decision to deny relief to defendant Christopher Coleman following an evidentiary hearing on his second successive postconviction petition, which raised a claim of actual innocence, was manifestly erroneous. In resolving that issue, we also must address whether *People v. Washington*, 171 Ill. 2d 475 (1996), which announced the standard in Illinois for evaluating postconviction claims of actual innocence, should be discarded in favor of a more rigorous standard with roots in federal law.

¶ 2    Today, we reaffirm our holding in *Washington*, and reverse the judgments of the circuit court and the appellate court (2011 IL App (3d) 100419-U) and remand for a new trial.

¶ 3                              BACKGROUND

¶ 4    On August 22, 1994, several men entered a house in Peoria, where Bertha Miller lived with her two daughters, Tequilla and Tekelia, and her two sisters, Myre Lott and Angela Stimage. The men demanded money, then threatened and beat the occupants of the house. Two of the men took Tekelia into a bathroom, and one of them sexually assaulted her. She was 17 years old. When the police arrived, some of the men escaped. James Coats, Tekelia's assailant, and Robert Nixon were arrested at the house. At the police station that night, Tequilla saw Nixon and the defendant, who had been arrested at his girlfriend's nearby apartment in connection with the attack, walking with police officers. Tequilla subsequently

identified the defendant in a photo array and a lineup as one of the men. He was indicted for armed robbery, aggravated criminal sexual assault, home invasion, and residential burglary. Several months later, the defendant was tried before a jury.

¶ 5 Because our decision ultimately rests on the evidence presented at the defendant's trial and his postconviction evidentiary hearing, a thorough review of the record is necessary.

¶ 6 The State's case consisted of testimony from several of the victims, as well as two police officers and a 13-year-old named Anthony Brooks.

¶ 7 At trial, the State called 10 witnesses, and offered stipulations from 4 other witnesses.

¶ 8 Lott testified that there were six men wearing bandanas and a boy in the house during the attack. Though Lott described what happened throughout the house, she was in the living room with her head wrapped in a blanket for most of that time. Her account was based largely on what she heard for approximately two hours. She only saw the face of one of the men, whom she did not recognize, and she did not identify any of them.

¶ 9 Tequilla testified that on the night of the attack she was sleeping in her bedroom when she heard a noise. She awoke and ran to the living room, where she saw seven men, six of whom had guns, standing over Lott. The men pointed a gun at Tequilla, frisked her, and threw her to the floor, where they attempted unsuccessfully to put a leather couch pillow over her head. They wore dark clothes and bandanas, so Tequilla could see only their eyes. According to Tequilla, the men ordered her to lie still on the floor, then started beating her and Lott and demanding money. A tall man came into the living room, grabbed Tequilla by the hair, threatened to harm her if Lott did not give the men money, and cut Lott's leg. Tequilla stated the men kicked Lott in the face and pushed Tequilla back to the floor, where "a little boy" tripped over her on his way to run outside to serve as "a watch-out." The boy announced that he was tired of waiting outside, and that he did not see anyone coming.

¶ 10 Tequilla testified that two of the men took the bandanas off their faces. She did not recognize "the kind of light skin one" because she did not know him, but she recognized "the dark skin one" as "Fats" because her family had grown up with him over a five- or six-year period. Tequilla stated that she saw his face for a "good three minutes." In court, she identified this man as the defendant.

¶ 11 Tequilla testified that the boy returned to the house and said "5-o," meaning the police were coming to the house. The light-skinned man and the dark-skinned man, the defendant, fled together out the front door. The remaining five men locked the door and ordered the victims to go upstairs to Stimage's bedroom. Tequilla sensed the police were inside the house when the men began to hide their guns by wrapping them in Stimage's clothes. Prior to the police entering the house, two of the men jumped out the upstairs window, and "[t]he other one was trying to get into the closet," then "some of them" tried to jump out again, but "didn't get to."

¶ 12 Tequilla further testified that she did not know whether Fats had a gun on the night of the attack because she was looking at his face. He was telling the other men what to do, and when he asked them to hurry and get the money, they beat the victims. Tequilla stated that on the day after the attack, she went to the police station, where Peoria Police Detective Rabe showed her "a whole bunch," more than a hundred, of photographs of possible suspects.

From the photographs she picked out "[e]veryone that was there," including Fats. Later, Tequilla viewed a line-up of African-American men. From the line-up she picked out "[t]he ones that were there that night that I picked out in the photo[s]," including Fats. Tequilla stated that she picked him out "because his face stood out from the other ones." His face stood out because she remembered it; she remembered it because she knew him.

¶ 13    On cross-examination, Tequilla testified that the attack lasted approximately 30 minutes. She confirmed that there were seven men, who were all wearing bandanas. When she came into the living room, it was ransacked. According to Tequilla, Lott and two family friends were lying on their chests on the floor, but their heads were not wrapped in blankets. Six of the men were standing, and one was sitting, while the boy repeatedly exited and entered the front door. Tequilla stated that once the boy yelled "5-o," he and two men ran out the front door. After that, when the police knocked on the door, five men remained in the house. Tequilla explained that she did not count the boy among the men. But later she stated that during the attack, "It was six dudes left in the house, and one went outside, which he was a little boy."

¶ 14    Tequilla testified that only two of the men removed their bandanas, and only for three minutes, then they left. Tequilla stated that Fats, the defendant, stayed in the living room chair "most of the time" during the attack. He only removed his bandana when he was in the living room. According to Tequilla, Miller was not in the living room during the attack. Defense counsel asked Tequilla how she could have picked out all of the men if only two had removed their bandanas, and she stated that the two men who fled out the front door had removed their bandanas in the living room, but the remaining men did so upstairs.

¶ 15    Tequilla testified that at the police station she did not disclose she had seen the faces of two of the men. She stated that several weeks after the attack she testified before the grand jury, where she was asked if she recognized any of the men, and answered that she recognized one of them, Nixon. According to Tequilla, she did not give the grand jury the defendant's name "because I didn't remember until then—until now, I mean." She "just forgot" his name. Tequilla acknowledged that she picked out Elbert Nickerson in the photographs and the line-up at the police station, and told the police that he was one of the men. Tequilla insisted that she mentioned to police at the line-up that she was unsure about whether Nickerson was one of the men. Looking at the photographs again on the day before trial, she said that Nickerson was not one of the men "because he looked different from it personally face-to-face."

¶ 16    Tequilla testified that she identified six of the men in the line-up, including the defendant, Nickerson, and Mark Roberson. According to Tequilla, the police told her that in the line-ups they had "volunteers, and then there were people that I named out that were in the line-up." When asked whether it was easy for her to pick out suspects from the line-up because she had already seen their photos, Tequilla answered, "Yes, it was, because, hey, this, people have a look similar to what the people in the picture."

¶ 17    Defense counsel turned his questioning to the boy and asked whether the boy wore a bandana. Tequilla stated that she got "a real good look" at him when he tripped over her, but she could not determine whether he had a bandana over his face, even though he was a few

inches away from her. She was lying down, and her eyes were looking at his eyes. Tequilla testified that she could look at the defendant's face without the bandana from the floor, and she saw it again when she was pulled off the floor to go upstairs. At that point, she "got to see him before he left because he was sitting in the chair still."

¶ 18     On redirect examination, Tequilla testified that she was positive that the man in the chair was the defendant, and that she had seen his whole face. She did not tell the grand jury the defendant's nickname because she did not know his name. She also did not tell the police the defendant's nickname. Tequilla stated that she picked out Nickerson in the line-up, even though she was unsure he was one of the men, "[b]ecause him and the dude look similar to each other." She picked out the defendant because she was positive that his face was the face she saw on the night of the attack.

¶ 19     Detrice Friend, Tekelia's boyfriend who was at Miller's house during the attack, and Edward Gaffney, a Peoria police department officer who responded to a call about the attack, testified. Neither identified the defendant.

¶ 20     Miller testified that on the night of the attack she was asleep in her bed, when one of her daughters shook her and said they were being robbed. Miller awoke to see a gun in her daughter's mouth. According to Miller, she followed the directions of the men and handed them her purse. She stated that she gave it to the defendant. The State asked Miller about him.

> "Q. And as you sit here today, how do you know Christopher Coleman?
>
> A. Because I know his voice, and I know how he walk.
>
> Q. What is distinctive about his walk?
>
> A. Walk kind of crooked like. He doesn't walk like a regular walk.
>
> Q. And what about his voice was familiar to you?
>
> A. I know his voice. He done growed up, but I know his voice from being a kid.
>
> Q. How do you know him from being a kid?
>
> A. I used to run around the street with his mom when we was younger. He was, he at my house and what happened.
>
> Q. So how long have you known Christopher Coleman?
>
> A. About 19 or 20 years."

¶ 21     Miller gave the men her purse because they had threatened to kill her daughter. The men asked her for more money, and she said that Lott had it. The men thought Miller was lying, so they flipped her mattress and found more money. According to Miller, the men started beating her, struck her head, and put a knife to her back. They threatened to hurt her daughters if she did not give them all of her money. Miller suggested that the man get a job, and he smashed a vase on her head. Miller testified that she pleaded for the men to leave, but they insisted that they expected to find $1,500 in the house. The men then repeatedly beat and kicked Miller, while she had a foot in her back and a gun in her face. She heard crying, as the men took Tekelia into the bathroom and raped her.

¶ 22     Miller testified that there were six or seven men in the house when the police arrived.

The police called for her and said they would not leave until they spoke with her. She told them that she could not get up because she was under her mattress. The police eventually helped her to her feet, and she ran to the back door with Tekelia, whom the men had released to stop the police from coming through that door. The police ordered Miller and Tekelia to take cover behind a truck sitting in the yard. Miller saw two men jump from the window, and she screamed to tell the police. Those two men escaped, but a third man who jumped from the window was apprehended. According to Miller, the third man was Coats. The police apprehended Nixon inside the house.

¶ 23    On cross-examination, Miller testified that during the attack she did not leave her bedroom until she ran to the back door. Miller stated that the men had scarves over their faces and hats on their heads. Two or three of the men stayed in her room at all times during the attack. She could not recall "how many hours" the attack lasted, but she knew it was a long time.

¶ 24    Miller stated that she knew the defendant "real well" from his walk. She did not see his face, or any of the men's faces, until she saw Nixon's face after he was apprehended and brought out of the house by the police. During the attack the defendant was standing in her bedroom doorway while other men beat and kicked her. He took her purse and ordered one of the men to hit her with the vase. Miller insisted to defense counsel that the defendant was one of the men: "You understand me, *** he was there. Do you understand what I am saying? I know him. Can nobody doubt me that I would know him. Thank you, sir. I know that he was there." She added:

> "I know that from his voice, and I know that from his walk. I was not blind. *** I know his voice from being an individual; I know his voice from being an adult, too. I seen Chris Coleman a lot of time. I don't associate with him because I have no right. He's a kid to me, but I know Chris Coleman."

¶ 25    Miller testified that she did not give the police details about the men because she was "shook up" after the attack, and she did not give the police the defendant's name because they did not ask her in detail about him. She would have told the police more if they had asked her more questions. On re-cross-examination, defense counsel asked Miller if, when questioned before the grand jury about the identity of the men, she remembered saying, "I know Chris Coleman from a little kid, but I didn't know at the time that was him." She stated that she might have given that answer.

¶ 26    Tekelia testified that she did not know how many men were in the house during the attack, but mentioned that a boy was with them. She stated that one of the men smashed a vase over her mother's head, then forced her into the bathroom, where another man sexually assaulted her. She identified that man as Coats, but she did not identify any of the other men.

¶ 27    Stimage testified that she was upstairs when the attack began, and that it lasted for approximately one hour. She saw the faces of four of the men, including a light-skinned man, who threw her into a wall and caused her to lose consciousness for several seconds. Like Lott, Stimage did not identify any of the men.

¶ 28    Peoria police department Officer Walter Jatkowski testified that he processed the inside of the house for evidence on the night of the attack. According to Officer Jatkowski,

-6-

fingerprint and palm prints that he lifted from the floor of the bathroom indicated Coats was the man who sexually assaulted Tekelia. On cross-examination by defense counsel, Officer Jatkowski stated that none of the fingerprints he lifted from the house matched the defendant. On redirect examination, Officer Jatkowski explained, "I don't have fingerprints that match up to Chris Coleman. I can't put him at the scene, but I am not eliminating him from being at the scene, just physical evidence, there's nothing that shows."

¶ 29     The State offered stipulations from two nurses and a doctor at Methodist Hospital in Peoria, as well as a forensic scientist at the Morton Crime Lab, who would have testified regarding the sexual assault on Tekelia. None of these witnesses would have testified regarding the defendant.

¶ 30     Anthony Brooks testified that he was 13 years old and was on juvenile probation for the home invasion of Miller's house. According to Brooks, he went to the house on the night of the attack with "Bug," Nixon, and "light skin" Fats. Brooks stated that there was another Fats. He also stated that the Fats who was at Miller's house was not in the courtroom, but that Fats, "the light skin one, kind of chubby," was in a holding cell at the courthouse that morning.

¶ 31     Brooks testified that he was interviewed by Detective Pat Rabe of the Peoria police department on the day of the attack.

> "Q. At that time, did you or did you not tell Detective Pat Rabe that Christopher Coleman was with you on the morning of August 22, 1994?
>
> A. There was two Fats on that day when he showed me.
>
> Q. Pardon me?
>
> A. They had two dudes. Both of them name was Fats on that paper, a light skin one and a dark skin one.
>
> Q. Which Fats did you tell him that was with you on the morning of August 22, 1994?
>
> A. Told both of them.
>
> Q. Both of them. Well, who is the dark skin Fats that you told Officer Rabe that was with you?
>
> A. But it was the light skin one.
>
> Q. Are you saying you told Officer Rabe on August 22, 1994, there were two Fats with you?
>
> A. He showed me two pictures of—He showed me the light skin picture of the other Fats, and he showed me that picture of him.
>
> Q. Who of him? Who is the other Fats picture he showed you?
>
> A. Some lights skins Fats. I don't know his real name."

Brooks identified the dark skin Fats from the police pictures as the defendant, and stated that he was at Miller's house on the night of the attack.

¶ 32     On cross-examination, Brooks testified that he knew two men nicknamed Fats. One is light-skinned with braids, and he was in a holding cell at the courthouse.

"Q. And did you say on when [the prosecutor] was questioning you, that was the person that was with you this night [at Miller's house] on August 22?

A. Yeah, I said that.

\* \* \*

Q. All right. And then you said, did I hear you just now to say that this person was with you [at Miller's house]?

A. Just said it.

Q. So are you saying that both people nicknamed Fats were [at Miller's house] now?

A. I'm saying it was one of them, and it was that light skin one with the braids in his head.

\* \* \*

Q. And you're saying the dark skin Fats was not with you [at Miller's house]?

A. Yeah."

Brooks stated that he told Detective Rabe that dark-skinned Fats was at Miller's house, but that statement was untrue. Brooks further stated that Detective Rabe showed him the picture of dark-skinned Fats and told him to identify him as one of the men at Miller's house, or Brooks would never see his family again. On redirect examination, Brooks testified that only three men went with him to Miller's house: Bug, Nixon, and Fats.

¶ 33    Detective Rabe testified that he investigated the attack at Miller's house and spoke to Brooks the next afternoon. Detective Rabe stated that Brooks described the defendant as "the ringleader in charge of the group" behind the attack. According to Detective Rabe, Brooks picked the defendant's photograph from an array. Detective Rabe conducted a line-up of five persons, which Tequilla viewed. She identified the defendant as one of the men without hesitation.

¶ 34    On re-cross-examination, Detective Rabe testified that Miller did not view photographs. The police did a computerized "cold search" of photographs of arrestees in Peoria County fitting the age, weight, and height of possible suspects. The defendant's photograph appeared inadvertently, and Miller identified him. On redirect examination, Detective Rabe testified that Tequilla viewed photographs of juveniles and adults. In the 8 to 10 photographs of juveniles, she identified Brooks. On re-cross-examination, Detective Rabe testified that Tequilla identified Nickerson, Mark Roberson, and the defendant after viewing the results of the cold search.

¶ 35    The defendant called four witnesses.

¶ 36    Nixon testified that he pleaded guilty after the attack and was sentenced to 12 years' imprisonment. Nixon stated that he was questioned by the police, but did not tell the truth. He admitted that he participated in the attack. According to Nixon, he knew the defendant, but the defendant was not at Miller's house that night.

¶ 37    On cross-examination, Nixon testified that "Merk, Lamont, Bug, Drey, and Rob" were with him on the night of the attack. Lamont was Lamont Lee. Bug was Coats. Drey was a

person that Nixon knew from the Warner Housing Project in Peoria, who had come there possibly from Detroit. Merk was Robert McKay. Rob was "another dude" that Nixon knew "through somebody else."

¶ 38    Shondra Dunn, the defendant's fiancee, testified that she was with him at a friend's apartment on the night of the attack from around 10:30 p.m. until he was arrested there around 3 a.m.

¶ 39    Tamika Young testified that she had known the defendant for approximately five years, and that she saw him on the night of the attack at that apartment. According to Young, the defendant was there from 12:15 a.m. until the police arrived at 2 a.m. On cross-examination, Young testified that she called the defendant by his nickname, Fats.

¶ 40    The defendant testified that on the night of the attack he was with Dunn at the apartment on the night of the attack from 10 p.m. until 3 a.m., when he was arrested. He denied participating in the attack.

¶ 41    On cross-examination, the defendant testified that some people called him Fats. He stated that he grew up in Peoria, and that he knew Miller: "I know Bertha Miller, but I don't know Bertha Miller like she say I know her. I didn't even know, I don't even know how she look until yesterday." The defendant further stated that he knew Tequilla when they were children, but not well enough to speak to her. He also knew Brooks from their neighborhood.

¶ 42    In rebuttal, the State called Tequilla back as a witness. She testified about her erroneous identification of Elbert Nickerson. She stated, "Because at the line-up I was unsure, and I wanted to make sure that everything was okay because I didn't want him to go to jail for something he didn't do. So I had them recall his picture back up to me so I can look at it again or any mistakes be made." After she reexamined Nickerson's picture, she decided that he was not one of the men in her mother's house on the night of the attack. She stated that she had no doubt that the defendant was one of the men.

¶ 43    The jury found the defendant guilty of home invasion, aggravated criminal sexual assault, armed robbery, and residential burglary. Prior to sentencing the defendant filed a posttrial motion in which he argued, *inter alia*, that the State had failed to prove him guilty beyond a reasonable doubt. The trial court conducted a hearing on that motion.

¶ 44    At that hearing, Coats testified that he had pleaded guilty in connection with the attack. He stated that Nixon, Lee, McKay, and "some guy named Dray" were with him at Miller's house, where they went to obtain money and drugs. According to Coats, the defendant was not there. On cross-examination, Coats testified that Brooks also was not there. Coats admitted that after his arrest he did not tell the police about Nixon, McKay, Lee, and Dray. On re-cross-examination, Coats stated that the defendant, through his attorney, had asked Coats to testify at the defendant's trial and that Coats had refused on fifth amendment grounds.

¶ 45    The defendant testified that defense counsel was concerned that Nixon and Coats would say different things, and convinced him that they should not be called as witnesses. The defendant stated that he talked to defense counsel about Mark Roberson. According to the defendant, Roberson's nickname was also Fats, and, like the defendant, he was "misidentified" by Tequilla as one of the men. When the defendant talked to defense counsel

about Nickerson, another person misidentified in connection with this case, it was too late to call him as a witness.

¶ 46    In denying the posttrial motion, the trial court stated that "the acts of the victims misidentifying people was thoroughly placed before the jury." The court stated that the case was not "particularly unique" because the outcome hinged on whether the jury found the State's witnesses or the defense's witnesses more credible. The trial court sentenced the defendant to consecutive terms of 30 years' imprisonment for armed robbery and aggravated criminal sexual assault. The appellate court affirmed his convictions and sentences. *People v. Coleman*, No. 3-95-0576 (1997) (unpublished order under Supreme Court Rule 23).

¶ 47    The defendant filed a postconviction petition, alleging that he received ineffective assistance of trial and appellate counsel. The trial court dismissed that petition, and the appellate court affirmed that decision. *People v. Coleman*, No. 3-99-0414 (2001) (unpublished order under Supreme Court Rule 23).

¶ 48    The defendant then filed a *pro se* successive postconviction petition, alleging that he received ineffective assistance of appellate counsel on the appeal of his postconviction petition. The trial court dismissed the successive petition as frivolous and patently without merit. The defendant filed a notice of appeal, but then filed a motion to dismiss the appeal, which was granted.

¶ 49    In 2009, the defendant filed a second successive postconviction petition, claiming actual innocence.[1] The petition was supported by affidavits from McKay, the defendant's brother Deondre Coleman (Deondre), Coat's brother Robert Coats (Robert), Roberson, Nickerson, Brooks, Nixon, and Coats. In response, the State did not ask the trial court to deny that motion, but, instead, denied the allegations in the petition and requested an evidentiary hearing. The trial court docketed the case for further proceedings and held a hearing.

¶ 50    The defendant called eight witnesses.

¶ 51    Coats testified that on the night of the attack he was at the Warner Housing Project "hanging out with friends"—Robert, Lee, "a homie named Dre," who was the defendant's brother Deondre, Nixon, and McKay. According to Coats, McKay walked with a limp. Coats stated that he and his friends went to Miller's house that night looking for money and drugs. The defendant was not with them.

¶ 52    Coats stated that he knew Brooks, Nickerson, and Roberson, whose nickname is "Fats." None of them were at Miller's house on the night of the attack. Coats further stated that the defendant's nickname is also "Fats," and he walks with a limp. Coats testified that he pleaded guilty to armed robbery in connection with the attack and received a sentence of 15 years' imprisonment. According to Coats, his attorney told him that he could receive a sentence of six years' imprisonment if he testified that the defendant was involved in the attack. Coats rejected that offer because the defendant "didn't have any involvement."

¶ 53    On cross-examination, Coats testified that he was currently incarcerated for felony

---

[1]The petition was signed by Karen Daniel of the Center on Wrongful Convictions, Bluhm Legal Clinic, Northwestern University School of Law.

possession of a controlled substance. He repeated that both McKay and the defendant walk with a limp. Coats stated that when McKay proposed going to Miller's house, he and some friends were drinking beer and smoking marijuana. Coats admitted that he told Detective Rabe a different story on the night of the attack. He said that he and a friend were forced into the house at gunpoint, but that story was untrue. When Detective Rabe asked whether the defendant was involved in the attack, Coats answered that the defendant was not involved.

¶ 54    The State reviewed Coats' affidavit with him. He stated that he was first contacted about signing it in 2006 or 2007 by a student from Northwestern University law school. He told the student that the defendant was not involved in the attack. He also told his parents and brother, Phillip Graham, and "just numerous of other people" that asked him about it.

¶ 55    On redirect examination, Coats stated that Detective Rabe first mentioned the defendant's name. Coats' affidavit did not implicate his brother Rob for fear of getting him in trouble, and he did not implicate his brother at the hearing on the defendant's posttrial motion for the same reason.

¶ 56    Lee testified that he was currently incarcerated for armed robbery. According to Lee, he was at Miller's house with Coats, Robert, Nixon, and McKay. Coats entered the house by the back window, and opened the door for the other men. Then Lee stated that an armed robbery took place. There were one or two guns involved, though some of the men pretended to have guns. Their faces were covered, and some wore hats. Lee estimated that seven or eight people occupied the house when the men entered it. When the police arrived, the men went upstairs. Lee stated that he and Robert escaped by jumping from an upstairs window. McKay left before the police arrived.

¶ 57    Lee testified that the attack lasted about an hour. After he escaped, Lee returned to the Warner Housing Project, and saw the police arrest the defendant. Lee had seen the defendant earlier that night with Dunn, and they went inside an apartment between 11 p.m. and midnight. According to Lee, the defendant was not at Miller's house "in no form or fashion," he was just inside the apartment. Lee did not speak to the defendant's attorney, only to law students around February 2007. Lee did not testify at the defendant's trial because that would have been "hanging" himself.

¶ 58    On cross-examination, Lee stated he knew Deondre, but he knew the defendant better. Neither was at Miller's house; only Lee, Coats, Robert, Nixon, and McKay. Lee stated that if he would have been called to testify at the defendant's trial, he would have "pleaded the Fifth, period."

¶ 59    The trial judge then asked Lee some questions. Lee confirmed that before the attack, he was with Coats, Robert, Nixon, and McKay. He saw the defendant at the Warner Housing Project sometime earlier that day.

¶ 60    Deondre testified that he is the defendant's brother. On the night of the attack, he saw the defendant, but he later left the Warner Housing Project with Nixon, McKay, Coats, Robert, and another man. According to Deondre, McKay walked with a limp, as does the defendant. The defendant did not accompany the men to Miller's house. McKay planned to rob the occupants of the house, but Deondre refused to participate and stood across the street from the house during the attack. Deondre stated that the defendant and Brooks were not at the

house that night. Deondre intended to testify at the defendant's trial, but before it occurred he was shot three times and left Peoria for a hospital in Detroit, Michigan.

¶ 61 On cross-examination, Deondre stated that the original plan on the night of the attack was to go to Miller's house to buy drugs with money that he and Nixon had. When they reached the house, McKay changed the plan. Deondre did not participate in the attack because he "don't about to rob nobody." When the men went around Miller's house toward the back door, Deondre began walking back to the Warner Housing Project.

¶ 62 Deondre testified that the next day, he was stopped at the Warner Housing Project by Barbara Stimage, Angela Stimage's daughter. He learned that the defendant had been arrested in connection with the attack. Deondre told Nixon, McKay, and Robert that he planned to testify that the defendant was not at Miller's house. Deondre was shot three days later. When he learned that the defendant was in prison, Deondre "felt bad," but did not tell the police or the defendant's attorney that he was not at Miller's house that night. Deondre did tell his father on the day before he was shot. Deondre added that, although he did not tell anyone else that the defendant was not involved, he would have told someone if he had been in Peoria at the time of trial.

¶ 63 Brooks testified that he was currently incarcerated. On the night of the attack, he was 12 years old, and he was arrested and charged with home invasion and robbery. At the police station, officers questioned Brooks. According to Brooks, "They started pulling out pictures. They said they knew I was there and they wanted me to point out Mr. Coleman and kept pointing at his picture, you know what I'm saying?" Brooks stated that he told police that he was not at Miller's house, and the police, including Detective Rabe, told him that he would never see his family again. In response, Brooks pointed to the defendant's picture and said he was at the house. Brooks stated, "I *** didn't know if he was there or not, I just was doing it so I could go home." He also told police that he was the lookout at the house.

¶ 64 On cross-examination, Brooks testified that he was in prison for aggravated unlawful use of a weapon. He was also convicted twice of felony possession of a controlled substance and was imprisoned for those offenses. According to Brooks, Detective Rabe said that he would never see his family and would be in prison for the rest of his life if he did not tell police who was at Miller's house on the night of the attack. Because Brooks was not involved in the attack, he did not know who was. However, he told Detective Rabe that he was there, and that the defendant directed the other men during the attack. Brooks repeated that his trial testimony implicating the defendant was untrue: "[E]verything about it was a lie." On redirect examination, Brooks stated that he "[f]elt kind of wrong because it wasn't true that another person was going to go to jail because from the lies I was telling just to go home." Brooks lied because he did not care about anyone except himself, but cared only about going home.

¶ 65 Nickerson testified that he was currently incarcerated. He was arrested and charged with home invasion, armed robbery, burglary, and sexual assault in connection with the attack. He stated that he was never involved. According to Nickerson, the defendant, Coats, Nixon, and some other men were also charged in connection with the attack. Nickerson stated that on the day of his trial, the charges against him were dismissed. Nickerson testified that while

he and Coats were in the same pod at the Peoria County jail, awaiting trial, Coats said that he knew Nickerson and the defendant were not involved. Coats also said that some men involved were his brother Robert, Nixon, and "a couple of their other friends," including Lee and McKay. Nickerson stated that McKay walked with a limp.

¶ 66 On cross-examination, Nickerson stated that he was incarcerated for aggravated unlawful use of a weapon and was serving a 4½-year sentence. He was also convicted for violating an order of protection, for forgery, and for a bail bond violation. Nickerson saw the defendant in jail. After he was released, Nickerson left Peoria, and did not learn that the defendant was convicted until he returned several months later. He never told the police that the defendant was not involved in the attack because "they already knew." Nickerson talked to the defendant's lawyer in 2009, and would have testified sooner if he would have been contacted sooner.

¶ 67 Robert testified that he was Coats' younger brother. He stated that he knew Nixon, Deondre, and McKay. McKay walked with a limp. When postconviction counsel asked Robert about the night of the attack, he asked for an attorney. A public defender was appointed and consulted with him. The trial court held a hearing, and concluded that the limitations period had run on any of the offenses with which he could be charged and ordered him to resume his testimony.

¶ 68 Robert testified that on the day before the attack, he was with Coats, Lee, Nixon, McKay, and Deondre. The group walked to Miller's house. The defendant, who walks with a limp, was not with them. Brooks, Nickerson, and Roberson, whose nickname is "Fats," were also not with them. Robert stated that after his brother opened the back door of Miller's house, the men entered and robbed the victims. Robert was the only one with a gun. The men all wore bandanas to cover their faces. Robert did not remember Deondre being inside the house. According to Robert, he went into the living room, and "[p]ut the people down" at gunpoint and collected the money and the marijuana. He tried to get into the bathroom, but could not because Lee was inside holding the door closed. At some point, the police arrived at the house. Lee went to the door and told them "everything was cool," and they were "just having a party." Everyone in the house then went upstairs. Robert stuffed his gun in a box and jumped out the window. Lee and Coats also jumped out the window. Robert escaped, and he was never arrested or questioned in connection with the attack. He stated that he would not have testified at the defendant's trial for fear of imprisonment.

¶ 69 On cross-examination, Robert testified that he was smoking marijuana all day before the attack, and he was under the influence of marijuana when he left the Warner Housing Project for Miller's house. According to Robert, the men went to the house to buy marijuana. Before that night, Robert had been there "a few times" to buy marijuana. He estimated that the attack lasted around 10 minutes. Robert stated that he probably told Deondre that the defendant was not involved. He told others the same story: "I said there is only one person that's in jail and they didn't do it and that's Christopher Coleman. I said that to a lot of people in the joint, out of the joint." He added, "I didn't say it was too bad. I said it's messed up that he is in there, but sometimes that's how life goes. You get a bad break." On redirect examination, Robert testified that, even though he was under the influence of marijuana on the night of the attack, he knew that the defendant was not at Miller's house.

-13-

¶ 70      McKay testified that he was currently incarcerated. His nickname is Merk. McKay walks with a limp, after jumping out a window and injuring his leg in 1993. Hours before the attack, McKay was at the Warner Housing Project with Lee, Nixon, Robert, and Deondre. Coats joined them shortly. McKay testified that the defendant was with them initially, but went "in the house with his girlfriend" when the men left for Miller's house. According to McKay, the men went to Miller's house to buy marijuana, but a robbery took place after they entered the house. McKay stated that the men "got reefer and money and left." The money and marijuana were in a bedroom. McKay covered his face with a shirt that was in the house. The defendant was not there at any time during the attack.

¶ 71      McKay testified that he knew Nickerson and Roberson, and they were not at the house that night. According to McKay, Brooks was with him when he went there. McKay was arrested on an unrelated charge a few days after the attack, and was incarcerated for approximately a year. He would not have testified at the defendant's trial because that testimony would have implicated himself.

¶ 72      On cross-examination, McKay testified that he had smoked "two or three dime bags" of marijuana with Lee, and when he left for Miller's house, he had a "mild buzz." Lee had the idea to turn the purchase of marijuana into a robbery. McKay stated that he thought Lee was the first person to break into the house. And Lee, Coats, Nixon, Robert, and Deondre all went in the house. They were inside the house for "[p]robably about almost two minutes." McKay found money and marijuana on the floor of a bedroom beside the bed. He picked up the money and marijuana and left the house with Deondre. He stated that he did not go upstairs, and Lee was the only man with a gun.

¶ 73      McKay testified that he did not speak with Roberson or Nickerson about the attack. He learned that the defendant had been arrested in connection with the attack a couple of days later. He spoke to Nixon about the defendant and his lack of involvement, while the two were in jail together. McKay cared that the defendant was going to prison for crimes he did not commit, but McKay "was facing some trouble" himself.

¶ 74      Roberson testified that he was arrested in October or November 1994 in connection with the attack. According to Roberson, "I was told that I supposed to participated in armed robbery and home invasion and rape. And they [the police] asked me where I was at, and I told him—I gave them my alibi and told them I was at work and they called my alibi and confirmed it." At the time, Roberson was working at a fast food restaurant in Glendale Heights, Illinois, near Chicago. He was released three days later.

¶ 75      The State called a single witness, Detective Rabe.

¶ 76      Detective Rabe testified that in the course of his investigation into the attack, he interviewed Brooks. He did not threaten Brooks, and did not tell him that he would never see his family again if he did not answer questions about the attack or if he did not identify the defendant as one of the men. According to Detective Rabe, Brooks stated that the defendant was at Miller's house and participated in the attack. On cross-examination, Detective Rabe testified that Coats and Nixon both denied involvement in the attack when they were interviewed, and neither identified any accomplices. Because the victims said that several men were involved, and one of the victims recognized one of the men from the Warner

-14-

Housing Project, Detective Rabe spoke to officers who worked that beat. The officers identified the defendant, Brooks, Roberson, and Nickerson as possible suspects. Detective Rabe assembled some photo arrays with pictures of the men, and Tequilla identified all four as being in her mother's house on the night of the attack.

¶ 77　In a written order, the trial court denied relief to the defendant. The trial court reviewed the postconviction evidence in light of the trial evidence. The court noted that several of the defense witnesses, who claimed that the defendant was not involved in the attack, had extensive criminal records, and that they "gave significantly conflicting accounts on what happened and who was present." Additionally, none of them mentioned the sexual assault. The trial court concluded:

> "Is it possible that that the Petitioner is actually innocent? Yes, even the most efficacious court system in the world cannot achieve absolute truth. Is it possible that these cohort witnesses are now coming forth with nothing to lose in order to help Petitioner—the person giving the orders during the home invasion?[ ] yes. Is the evidence offered at this hearing of such a conclusive character that it would probably change the result on retrial? No."

¶ 78　The appellate court affirmed. 2011 IL App (3d) 100419-U. The appellate court agreed with the trial court's "well reasoned decision, finding the information provided to the court during the postconviction hearing would not be likely to affect the outcome of a new trial." *Id.* ¶ 55. According to the appellate court, that decision was not against the manifest weight of the evidence. *Id.*

¶ 79　This court allowed the defendant's petition for leave to appeal. See Ill. S. Ct. R. 315(a) (eff. Feb. 26, 2010). The court also allowed 40 Illinois attorneys to file a joint *amicus curiae* brief in support of the defendant. See Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 80　ANALYSIS

¶ 81　The Post-Conviction Hearing Act allows a criminal defendant to assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a) (West 2010). The Act contemplates the filing of a single petition: "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived." 725 ILCS 5/122-3 (West 2010). That statutory bar will be relaxed only "when fundamental fairness so requires." *People v. Pitsonbarger*, 205 Ill. 2d 444, 458 (2002) (citing *People v. Flores*, 153 Ill. 2d 264, 274 (1992)).

¶ 82　We have stated that, outside the context of capital litigation, there are two such instances, or two exceptions, to this procedural default rule. See *People v. Edwards*, 2012 IL 111711, ¶ 22. First, a defendant may raise a defaulted constitutional claim by satisfying the so-called "cause-and-prejudice" test. See *Pitsonbarger*, 205 Ill. 2d at 459; 725 ILCS 5/122-3 (West 2010). To establish "cause," the defendant must show some objective factor external to the defense impeded his ability to raise the claim in the initial postconviction proceeding. *Pitsonbarger*, 205 Ill. 2d at 460. To establish "prejudice," the defendant must show the claimed constitutional error so infected his trial that the resulting conviction violated due

process. *Id.* at 464.

¶ 83 Second, even without showing cause and prejudice, a defendant may bring a claim of actual innocence to prevent a fundamental miscarriage of justice. *People v. Ortiz*, 235 Ill. 2d 319, 329 (2009). In *People v. Washington*, 171 Ill. 2d 475 (1996), we considered whether a claim of actual innocence implicates a federal or state constitutional right, which would allow a defendant to raise that claim in a postconviction proceeding. In addressing federal due process, we examined *Herrera v. Collins*, 506 U.S. 390 (1993). There, the United States Supreme Court used the terms "freestanding" and "gateway" to describe two types of actual-innocence claims raised in successive federal *habeas corpus* petitions. According to the Court, a freestanding actual-innocence claim is independent of any claims of constitutional error at trial and focuses solely on a defendant's factual innocence in light of new evidence. *Id.* at 400. A gateway actual-innocence claim is ancillary to any claims of constitutional trial error. Such a claim is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* at 404. In closing, the Court stated that assuming, *arguendo*, the execution of a capital defendant who made a "truly persuasive demonstration of 'actual innocence' " would violate the Constitution, the evidentiary burden on such a defendant to obtain federal *habeas* relief would be "extraordinarily high." *Id.* at 417.

¶ 84 In *Washington*, we concluded that despite this comment, "*Herrera* clearly states *** that a freestanding claim of innocence is not cognizable as a fourteenth amendment due process claim." *Washington*, 171 Ill. 2d at 485. But because "we labor under no self-imposed constraint to follow federal precedent in 'lockstep' [citation] in defining Illinois' due process protection," we turned to our state constitution. *Id.* We observed that there are decisions in which this court has "perfunctorily evaluated" new evidence claims under the Post-Conviction Hearing Act as if they were raised in a motion for a new trial. *Id.* at 486 (citing *People v. Silagy*, 116 Ill. 2d 357, 368 (1987), citing *People v. Molstad*, 101 Ill. 2d 128, 134 (1984)). But those decisions have never expressly identified the constitutional basis for such claims. We clarified that actual-innocence claims are grounded in due process and departed from *Herrera*, holding "as a matter of Illinois constitutional jurisprudence that a claim of newly discovered evidence showing a defendant to be actually innocent of the crime for which he was convicted is cognizable as a matter of due process." *Id.* at 488-89. Procedurally, a trial court should treat such a claim like any other postconviction claim. *Id.* at 489. Substantively, a court should grant relief only if the defendant has presented supporting evidence that is "new, material, noncumulative and, most importantly, ' "of such conclusive character" ' as would ' "probably change the result on retrial." ' " *Id.* (quoting *Silagy*, 116 Ill. 2d at 368, quoting *Molstad*, 101 Ill. 2d at 134).[2]

¶ 85 But before we can discuss the defendant's evidence and review the trial court's decision on that evidence, we must address a threshold issue raised by the State. In its response brief,

_____

[2]In *People v. Caballes*, 221 Ill. 2d 282, 314 (2006), we noted that *Washington* modified the "limited lockstep approach" adopted in *People v. Tisler*, 103 Ill. 2d 226 (1984), "to allow for consideration of state tradition and values as reflected by long-standing state case precedent."

the State contends for the first time in this case that *Washington* is fundamentally flawed and its substantive standard should be discarded. According to the State, that standard is too lenient because it excuses the defendant from making a truly persuasive demonstration of actual innocence. The State proposes a stricter standard, which purportedly derives from *Schlup v. Delo*, 513 U.S. 298 (1995).

¶ 86    In *Schlup*, the Court, as it had in *Herrera*, again distinguished between freestanding and gateway claims of actual innocence. The Court held that to obtain *habeas* relief on a gateway actual-innocence claim, a defendant must show that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327. Although the Court has never recognized the viability of a freestanding actual-innocence claim, and, consequently, has not decided which standard would apply to such a claim, it has speculated that such a standard would theoretically require more convincing proof. See *House v. Bell*, 547 U.S. 518, 555 (2006).

¶ 87    The State expands upon this point, arguing that the proper substantive standard for a postconviction freestanding claim of actual innocence in Illinois is an "enhanced *Schlup* showing." That proposed standard would force the defendant to prove that no reasonable juror would have found him guilty in light of the new evidence, which is what *Schlup* requires, and do so by clear and convincing evidence, which would enhance what *Schlup* requires. According to the State, the so-called enhanced *Schlup* standard is appropriate because (1) it demands a truly persuasive demonstration of innocence, so it fits the reasoning of *Washington* better than the standard we adopted there; (2) it tracks the practice for litigating actual-innocence claims in other states; and (3) "adopting the enhanced *Schlup* standard for freestanding innocence claims, while reserving the *Schlup* standard for gateway claims, will cure the current anomaly in this Court's actual innocence jurisprudence, under which freestanding actual innocence claims are easier to establish than gateway actual innocence claims."

¶ 88    We reject the State's argument for several reasons.

¶ 89    The State's argument rests largely on a faulty initial premise. The State simply assumes that this court, like the United States Supreme Court, has recognized two types of actual-innocence claims. We have not. To the Court, the distinction between freestanding and gateway claims hinges on fundamentally different "assumptions about the validity of the proceedings" and concomitantly different levels of respect afforded to the resulting convictions. *Schlup*, 513 U.S. at 315. When faced with a freestanding claim, in which a defendant challenges only his factual innocence, a *habeas* court may have confidence in the result because the underlying trial was error-free. *Id.* When faced with a gateway claim, in which the defendant challenges both his factual innocence and the fairness of his trial, a court may have less confidence in the result. *Id.* at 316. That, in the Court's view, changes the evidentiary burden:

> "In *Herrera* (on the assumption that petitioner's claim was, in principle, legally well founded), the evidence of innocence would have had to be strong enough to make his execution 'constitutionally intolerable' *even if* his conviction was the product of a fair trial. For [the petitioner in *Schlup*], the evidence must establish sufficient doubt about

-17-

his guilt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial." (Emphases in original.) *Id.*

¶ 90　We departed from precisely this approach in *Washington*. There, we stated:

"The Supreme Court rejected substantive due process as a means to recognize freestanding innocence claims because of the idea that a person convicted in a constitutionally fair trial must be viewed as guilty. That made it impossible for such a person to claim that he, an innocent person, was unfairly convicted.

We think that the Court overlooked that a 'truly persuasive demonstration of innocence' would, in hindsight, undermine the legal construct precluding a substantive due process analysis. The stronger the claim—the more likely it is that a convicted person is actually innocent—the weaker is the legal construct dictating that the person be viewed as guilty. A 'truly persuasive demonstration of innocence' would effectively reduce the idea to legal fiction. At the point where the construct falls apart, application of substantive due process principles *** is invited." *Washington*, 171 Ill. 2d at 488.

The assumptions that led the Court to distinguish between freestanding and gateway claims, and the legal construct that springs from those assumptions, are integral parts of the federal due process rubric that we declined to follow, as a matter of state constitutional law. We may have used the label "freestanding" to describe the claim in *Washington*, but not as an alternative to the label "gateway."

¶ 91　In Illinois, a postconviction actual-innocence claim is just that—a postconviction actual-innocence claim. Where a defendant makes a claim of trial error, as well as a claim of actual innocence, in a successive postconviction petition, the former claim must meet the cause-and-prejudice standard, and the latter claim must meet the *Washington* standard. See *Ortiz*, 235 Ill. 2d at 330 ("where a defendant sets forth a claim of actual innocence in a successive postconviction petition, the defendant is excused from showing cause and prejudice"). There is no anomaly in our case law because the evidentiary burden for an actual-innocence claim is always the same whether or not it would be considered a freestanding or gateway claim under federal law.

¶ 92　Without the benefit of that distinction, the State's argument unravels. *Schlup*, as well as any cases from other states that have chosen to align themselves with federal law in this context, are irrelevant. Further, because the Court has never recognized the viability of a freestanding actual-innocence claim raised in a successive *habeas corpus* petition, its comments in *Herrera* on the evidentiary burden required to advance such a claim are pure *obiter dicta*, and unpersuasive. Finally, the State's proposed standard, which would impose a "clear and convincing" burden of proof and make an actual-innocence claim harder to prove than any other postconviction claim, is inappropriate. An actual-innocence claim should be treated procedurally like any other postconviction claim (*Washington*, 171 Ill. 2d at 489), and "[i]n a post-conviction hearing the burden of proof is upon the petitioner to show a denial of [a] constitutional right by a preponderance of the evidence." *People v. Stovall*, 47 Ill. 2d 42, 47 (1970).

¶ 93　The State's argument essentially repackages an argument made by then-Chief Justice

Bilandic in his dissent upon denial of rehearing in *Washington*. See *Washington*, 171 Ill. 2d at 505-10 (Bilandic, C.J., dissenting upon denial of rehearing, joined by Miller, J.). That argument was rejected by a majority of this court. In the 17 years since we decided *Washington*, nothing has changed. Our commitment to that holding is unwavering. We have not diluted the substantive standard for actual-innocence claims, as the State thinks we did in *Ortiz*. And we have not strengthened that standard, as the State hopes we did in *Edwards*. In both cases, we reiterated that *Washington* provides the appropriate standard for ultimate relief. See *Edwards*, 2012 IL 111711, ¶ 32 (stating the "elements of a claim of actual innocence" and citing *Washington*); *Ortiz*, 235 Ill. 2d at 333.

¶ 94    As we stated in *Washington*, "no person convicted of a crime should be deprived of life or liberty given compelling evidence of actual innocence." *Washington*, 171 Ill. 2d at 489. That statement indicates that the standard we adopted is extraordinarily difficult to meet. In fact, as *amicus* informs us and our research confirms, courts of review have granted postconviction relief on actual-innocence claims in only three reported cases since 1996. See *People v. Burrows*, 172 Ill. 2d 169 (1996) (decided the same day as *Washington*); *Ortiz*, 235 Ill. 2d 319; *People v. Starks*, 365 Ill. App. 3d 592 (2006).

¶ 95    Although *Washington* is now familiar to the bench and bar, we take this opportunity to clarify how it should be applied.

¶ 96    Substantively, in order to succeed on a claim of actual innocence, the defendant must present new, material, noncumulative evidence that is so conclusive it would probably change the result on retrial. *Washington*, 171 Ill. 2d at 489. New means the evidence was discovered after trial and could not have been discovered earlier through the exercise of due diligence. See *Burrows*, 172 Ill. 2d at 180. Material means the evidence is relevant and probative of the petitioner's innocence. *People v. Smith*, 177 Ill. 2d 53, 82-83 (1997). Noncumulative means the evidence adds to what the jury heard. *Molstad*, 101 Ill. 2d at 135. And conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result. *Ortiz*, 235 Ill. 2d at 336-37.

¶ 97    In practice, the trial court typically will review the evidence presented at the evidentiary hearing to determine first whether it was new, material, and noncumulative. If any of it was, the trial court then must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict. This is a comprehensive approach and involves credibility determinations that are uniquely appropriate for trial judges to make. But the trial court should not redecide the defendant's guilt in deciding whether to grant relief. See *Molstad*, 101 Ill. 2d at 136 ("this does not mean that [the defendant] is innocent, merely that all of the facts and surrounding circumstances *** should be scrutinized more closely to determine [his] guilt or innocence"). Indeed, the sufficiency of the State's evidence to convict beyond a reasonable doubt is not the determination that the trial court must make. If it were, the remedy would be an acquittal, not a new trial. See *Washington*, 171 Ill. 2d at 497 (McMorrow, J., specially concurring) ("where a reviewing court determines that no rational trier of fact could find the defendant guilty beyond a reasonable doubt, the proper remedy is not a new trial but an acquittal"). Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together. See *People v.*

*Davis*, 2012 IL App (4th) 110305, ¶¶ 62-64 ("New evidence need not be completely dispositive of an issue to be likely to change the result upon retrial.").

¶ 98    Turning to the central issue in this case, the merits of the defendant's petition and actual-innocence claim, we review the trial court's decision to deny relief following an evidentiary hearing for manifest error. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004). Manifest error is "clearly evident, plain, and indisputable." *Id.* at 155. Thus, a decision is manifestly erroneous when the opposite conclusion is clearly evident. *In re Cutright*, 233 Ill. 2d 474, 488 (2009). On this point, the parties' positions are clear and simply stated. The defendant contends that the trial court's decision was manifestly erroneous under the *Washington* standard. The State summarily disagrees, responding in the last few pages of its brief that the trial court's decision was not manifestly erroneous under that standard. The State, however, does not dispute that the defendant's evidence was new, material, and noncumulative.

¶ 99    The trial court found that the evidence was new, except for the testimony of Brooks, who testified at trial, and Coats, who testified at the hearing on the defendant's posttrial motion. The trial court further found that the evidence was material, except the testimony of Nickerson and Roberson, who did not state that the defendant was not involved in the attack. Finally, the trial court found that the remaining evidence—namely, the testimony from Coats, Lee, Deondre, Robert, and McKay—was cumulative of the trial testimony of Nixon, who stated that the defendant was not involved.

¶ 100   Regarding the testimony of Nickerson and Roberson, we conclude that it was not new because it could have been discovered earlier through the exercise of due diligence. None of the eight defense witnesses, except Brooks, testified at trial, but Nickerson and Roberson were arrested in connection with the attack. Presumably, the defense knew this before trial, but chose not to call them as witnesses, even to undermine Tequilla's credibility after misidentifying them. In the hearing on the defendant's posttrial motion, defense counsel explained that he did not call Roberson as a witness because his testimony would not have helped the defendant. Additionally, the defendant stated that he talked to defense counsel about Nickerson, but by then it was too late to call him.[3]

¶ 101   Regarding the testimony of Brooks, we conclude that it was not material. At the defendant's trial, Brooks' testimony was nearly incomprehensible, particularly his answers to questions about two men nicknamed "Fats." Brooks stated that he was at Miller's house on the night of the attack, and he seemed to implicate the defendant on direct examination, then exculpate him on cross-examination. In the evidentiary hearing, Brooks was less equivocal. He stated that he was not involved in the attack and did not know who was. This was a different story from the one he offered at trial, but it was not relevant or probative of the defendant's innocence.

---

[3]We note that Nickerson testified that while he was incarcerated and awaiting trial, he spoke with Coats, who said he knew Nickerson and the defendant were not involved in the attack. Nickerson's testimony about that conversation was hearsay. Roberson's affidavit included a similar statement about a conversation he had with McKay after the attack. Roberson did not testify about that conversation, but testimony about it would also be hearsay.

¶ 102    That leaves the testimony of the five men who admitted that they were involved in, or present for, the attack: Coats, Lee, Deondre, Robert, and McKay. Nixon's trial testimony implicating these men seems to indicate that the defense may have known about their roles before trial, but they likely would have asserted their fifth amendment privileges if called to testify. Lee, Robert, and McKay said they would have done so, and, in his testimony at the hearing on the defendant's posttrial motion, Coats also said he would have done so. Only Deondre did not say this, and he asserted that he never entered Miller's house and left the area before the attack began. The testimony of these witnesses was new evidence. See *Molstad*, 101 Ill. 2d at 134-35.

¶ 103    The testimony of these witnesses was also material and noncumulative. All five of them stated that they were present for or involved in the attack, and all of them insisted that the defendant was not. This evidence was relevant, and probative of the defendant's innocence. Additionally, although they, like Nixon at trial, stated that the defendant was not at Miller's house on the night of the attack, their testimony was not before the jury at trial. The uncorroborated testimony of one of the men does not render the testimony of five of them merely cumulative, particularly where four of them were never charged in connection with the attack. Their testimony corroborated Nixon's testimony regarding the defendant, but also offered significant details that were missing from his account, including the fact that McKay and the defendant both walk with a limp. Thus, we conclude that the testimony of Coats, Lee, Deondre, Robert, and McKay was new, material, and noncumulative evidence.

¶ 104    Next, we must determine whether the trial court's decision that that evidence was not conclusive enough to probably change the result on retrial was manifestly erroneous.

¶ 105    The trial court noted that Coats, Lee, Robert, and McKay all had extensive criminal records, and that Coats, Robert, and McKay admitted drinking alcohol and smoking marijuana before the attack. The court observed that these witnesses offered conflicting accounts, particularly regarding the defendant's involvement, but none of them mentioned the sexual assault of Tekelia.

¶ 106    Although we agree that their voluntary intoxication and criminal records would affect their credibility on retrial, as would the discrepancies in their accounts nearly 16 years after the attack, these men were remarkably consistent on certain key details: they socialized at the Warner Housing Project before the attack; they went to Miller's house to steal drugs and money; Coats entered the house first through the back window, then opened the back door for the other men; the men had their faces covered during the attack; the men ordered many of the victims to lie on the living room floor, then took them upstairs; and three of the men jumped from the upstairs window when the police arrived. Most significantly, they were consistent on the issue of who was involved in, or present for, the attack.[4] Like Nixon, who testified at trial, they all stated that six men—Nixon, Coats, Lee, Deondre, Robert, and McKay—were at Miller's house that night, and the defendant was not. Lee, Deondre, and McKay even corroborated the defendant's alibi. And although none of the men mentioned

___

[4]Only Lee testified that Deondre was not there. The other men, including Deondre himself, stated that he was present at Miller's house.

-21-

the sexual assault, neither did Tequilla, whose sister was the victim of a terrible crime. The men were not asked about the sexual assault because that was not relevant to the ultimate issue of whether the defendant was there.

¶ 107    The trial court stated that these witnesses had "nothing to lose," a veiled reference to the fact that the limitations period had passed on the offenses committed during the attack. But in his trial testimony, Nixon implicated himself, McKay, Lee, Coats, Deondre, and Robert. And Coats, in his testimony at the hearing on the defendant's posttrial motion, implicated Nixon, who had already pleaded guilty, as well as Lee, McKay, and Deondre.[5] Despite this testimony, the State never pursued charges against any of these men in connection with the attack, and criminal liability weighed on their minds. Lee even refused to provide an affidavit, and Robert had to be counseled by a public defender that his testimony would not have penal consequences. This lends credence to their accounts.

¶ 108    Additionally, Detective Rabe's testimony at the evidentiary hearing was inconsistent with his trial testimony regarding his investigation. At trial, Detective Rabe described a computerized "cold search" that produced the photographs Tequilla saw. But Detective Rabe provided more details at the evidentiary hearing. Because the two men arrested at the crime scene, Coats and Nixon, refused to name their accomplices, Detective Rabe talked to officers who worked around the Warner Housing Project. These officers offered the names of four possible suspects—the defendant, Brooks, Nickerson, and Roberson—all of whom still maintain that they were not involved in the attack, and two of whom were actually released by the police. Detective Rabe assembled a photo array with pictures of those men, and Tequilla identified them all.

¶ 109    The State's evidence at trial was sufficient to convict the defendant, but it was far from overwhelming. There was no forensic evidence to link the defendant to the attack, and the State offered three identifications, all of which were significantly impeached.

¶ 110    Brooks' testimony on direct examination may have implicated the defendant as dark-skinned Fats, but his testimony on cross-examination definitely exonerated him.

¶ 111    Miller and Tequilla offered different versions of the attack because they were in different places. In Miller's version, the defendant orchestrated the attack from her bedroom doorway, not the living room. Miller did not see the defendant's face during the attack because it was covered, but she identified him from his voice as a child and as an adult, a characteristic she knew even though she denied associating with him, and his limp, a characteristic he shared with McKay. Miller did not give the defendant's name to the police after the attack because they did not ask about him. And she did not name him to the grand jury because she did not know at the time of the attack that was him.

¶ 112    In Tequilla's version, the defendant sat on a chair in the living room for most of the attack, directing the other men. Tequilla did not mention that the defendant was ever near Miller's bedroom. Tequilla saw the faces of two men while she was lying on the living room floor and they removed their bandanas. She identified one of them as the defendant, who, like

---

[5]At the evidentiary hearing, Coats explained that he did not include Robert in this group because he wanted to protect him.

Roberson, was nicknamed Fats. However, like her mother, she did not give the defendant's name or nickname to the police. And she named only Nixon to the grand jury because she had forgotten the defendant's name, and presumably his nickname. Of the six men she picked out from the photo array and the lineup, two—Coats and Nixon—were arrested at the scene, two—Nickerson and Roberson—were misidentified, and two—Brooks and the defendant—continue to deny their involvement. Tequilla never identified any of the four men who were implicated by Nixon and Coats, who were never arrested in connection with the attack, and who now assert they were at Miller's house that night.

¶ 113    The testimony of Coats, Lee, Deondre, Robert, and McKay was discredited by their criminal backgrounds, intoxication, and acquaintance with the defendant. Those men, however, all directly contradicted Miller and Tequilla on the ultimate issue before the jury: who was involved in the attack. We believe that the evidence presented by the defendant at the evidentiary hearing, together with the evidence presented by the defendant at trial, places the evidence presented by the State in a new light and undermines our confidence in that evidence and the result it produced. Weighed against the State's evidence, the defendant's new evidence is conclusive enough that another trier of fact would probably reach a different result.

¶ 114    This case is strikingly similar to *Molstad*. There, the State presented testimony from an eyewitness who identified the defendant and his five codefendants as participants in the battery of her boyfriend. The defendant denied that he was present for the attack, and he presented alibi testimony from his parents. This court granted the defendant a new trial. Here, we reach the same conclusion. Because the trial court's decision was manifestly erroneous, the defendant is entitled to postconviction relief in the form a new trial. As we stated in *Ortiz*, 235 Ill. 2d at 337, on remand, "[t]he fact finder will be charged with determining the credibility of the witnesses in light of the newly discovered evidence and with balancing the conflicting eyewitness accounts."

¶ 115                                      CONCLUSION
¶ 116    For the reasons that we have stated, the judgments of the circuit and appellate courts are reversed, and the cause is remanded to the circuit court for further proceedings.

¶ 117    Judgments reversed.
¶ 118    Cause remanded.