# Illinois Official Reports

## Appellate Court

---

### *People v. Coe*, **2021 IL App (4th) 200233**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDREW COE, Defendant-Appellant. |
| District & No. | Fourth District<br>No. 4-20-0233 |
| Filed | June 10, 2021 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 06-CF-219; the Hon. J. Casey Costigan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Catherine K. Hart, and Darrel F. Oman, of State Appellate Defender's Office, of Springfield, for appellant.<br><br>Don Knapp, State's Attorney, of Bloomington (Patrick Delfino, David J. Robinson, and James Ryan Williams, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE CAVANAGH delivered the judgment of the court, with opinion.<br>Presiding Justice Knecht and Justice Steigmann concurred in the judgment and opinion. |

**OPINION**

¶ 1   In the circuit court of McLean County, a jury found defendant, Andrew Coe, guilty of delivering a controlled substance within 1000 feet of a school (720 ILCS 570/407(b)(1) (West 2006)). For that offense, the court sentenced him to 12 years' imprisonment. He petitioned for postconviction relief. See 725 ILCS 5/122-1 (West 2008). In his amended petition, he alleged actual innocence and ineffective assistance. He claimed that Brian "Rio" Smith rather than he had delivered the cocaine. Also, he claimed that, by failing to interview and call alibi witnesses, his appointed trial counsel, Tracy Smith, had frustrated his sixth amendment right to receive effective assistance from counsel. See U.S. Const., amend. VI; *People v. Brooks*, 334 Ill. App. 3d 722, 725 (2002). After hearing evidence, the court denied the amended petition. Defendant appeals.

¶ 2   We are unable to characterize the circuit court's decision as manifestly erroneous. Therefore, we affirm the judgment.

¶ 3                              I. BACKGROUND
¶ 4                  A. The Evidence That Led to the Conviction
¶ 5                1. *The Controlled Purchase of February 15, 2006*
¶ 6   In the jury trial, which was held in June 2006, the State presented the following evidence regarding a controlled purchase of cocaine by a confidential informant.

¶ 7   The man who agreed to be a confidential informant, Nathan Hansen, testified that the police arrested him on February 11, 2006, for possessing 2.5 grams of marijuana. A few days later, on February 15, 2006, a detective, Darren Wolters, met with Hansen at the police station, and they talked. The State decided not to file any charges against Hansen for the 2.5 grams. Hansen, however, had a criminal charge pending against him for another offense, an unlawful delivery of marijuana. As he admitted in defendant's trial, he hoped that his cooperation as an informant would gain him some leniency.

¶ 8   In their meeting in the police station, Wolters proposed that Hansen make a controlled purchase of cocaine from defendant. Hansen had known defendant for about six months. He was not sure, but he thought that defendant lived at 807 North Roosevelt Street in Bloomington with a relative or friend known as "TT." Hansen knew defendant's telephone number, having bought cocaine from him in the past. He called defendant's number and recognized defendant's voice on the telephone. Defendant instructed him to come to TT's apartment.

¶ 9   On February 15, 2006, after the phone call to defendant, Wolters gave Hansen $200 in prerecorded bills, and the two of them left the police station in an unmarked police car. Wolters dropped Hansen off approximately a block from 807 North Roosevelt Street. Hansen testified that he then walked to that address, that defendant let him in through the rear door of the apartment, that he gave defendant the $200, and that in return defendant gave him 10 pieces of aluminum foil with rock cocaine wrapped up inside each piece of foil. Hansen identified defendant, in court, as the man who had sold him the cocaine (People's exhibit No. 2). Hansen testified that, after the transaction, he left the apartment and walked back to the car. Wolters had an evidence bag, into which Hansen dropped the 10 pieces of foil-wrapped cocaine. Then they returned to the police station.

¶ 10    Another detective, Brian Quinn, testified that he was assigned to perform video surveillance of the controlled purchase, which took place about the middle of the afternoon on February 15, 2006. His surveillance van was parked at the intersection of North Roosevelt Street and East Walnut Street, north of the residence. From that vantage point, Quinn was too far away to make out any facial features. He, assumed, however, that the man whom he saw walking down North Roosevelt Street from the south was the confidential source, for Wolters had radioed him that the source was approaching the residence. Quinn watched the source walk up the driveway and disappear around the corner of the residence. Shortly afterward, he saw the source emerge from behind the residence and walk down the driveway. The source then walked north on North Roosevelt Street, and Wolters picked him up.

¶ 11    Defense counsel, Tracy Smith, asked Quinn:

> "Q. And you did not see[,] nor did your camera record[,] the exact place where the [source] entered any of the buildings ***, is that accurate?
>
> A. That's correct[;] he was on the south side of the building[,] and I was on the north.
>
> Q. So we can't really tell[,] from what you saw personally or from what your camera recorded[,] whether he even entered the building, what building he entered[,] or what door of what building he entered?
>
> A. That's correct.
>
> > * * *
>
> Q. In the video, *** was there anything that you saw that was clearly some illegal activity? I mean, it's just a fellow walking between two houses and then returning[—]would that be accurate?
>
> A. That's what I saw from my vantage point, yes, sir."

¶ 12    2. *The Unsuccessful Attempt to Make Another Controlled Purchase*

¶ 13    On February 21, 2006, using an audio recording device, Hansen and Wolters attempted to make another controlled purchase of cocaine. Hansen returned to the house at 807 North Roosevelt Street and spoke with defendant. Hansen and defendant then walked to Wolter's unmarked car and got in. Wolter drove the three of them to a different house on Roosevelt Street, 712 North Roosevelt Street. The three of them entered that house. Defendant requested Wolters to smoke some crack cocaine to prove that he was not a police officer. Wolters refused. Defendant then balked at handing over any drugs to Hansen.

¶ 14    B. Smith's Investigation of the Possibility of Impeaching Hansen

¶ 15    On June 12, 2006, just before *voir dire*, the circuit court was reviewing an exhibit list with the attorneys to find out ahead of time if any exhibit had a problem or controversy associated with it that should be addressed outside the jury's presence.

¶ 16    One of the exhibits, defendant's exhibit No. 1, purported to be a signed statement by Hansen to the effect that he had falsely implicated defendant in exchange for a promise "by law enforcement" that a charge against him for delivering an ounce of cannabis would be dropped. The prosecutor warned that the impeachment might misfire. He anticipated that Hansen would deny having written, signed, or even seen this document and that Hansen also would deny having received any promises for his testimony.

¶ 17    After the prosecutor provided that preview, Smith told the circuit court, "Judge, my client, I'm sorry, just informed me, which I don't believe I had heard before, that he believes there [are] several witnesses to Mr. Hansen's making of this document." The court allowed Smith a few minutes to talk further with his client.

¶ 18    After a short break, Smith gave the circuit court the following update: "[W]hat my client has told me is that his aunt, Cynthia [Seymon], and another lady, Amber Mattingly, went with Mr. Hansen when he signed this piece of paper under oath and they would know where that was done." Smith requested a few minutes to go to his office so that he could attempt to reach these two witnesses by telephone. The court allowed a short recess for that purpose.

¶ 19    The proceedings went back on record, and Smith informed the circuit court that he had succeeded in reaching Cynthia Seymon on the telephone. She had told him that, although she herself had not seen Hansen sign the statement, she believed that Amber Mattingly might have seen him sign it. In her phone conversation with Smith, Seymon volunteered to find Mattingly and to speak with her. Smith further informed the court, "[Defendant] indicated that he is not at this point interested in asking to continue the matter so that I can get them under subpoena. *** [H]e did indicate that if all we're going to do is pick a jury today ***, we still had time."

¶ 20    In the afternoon session on June 13, 2006, after a jury had been chosen, Smith gave the circuit court another update:

> "Just by way of information, yesterday, I believe, just before we started picking the jury, [defendant] indicated to me that there were two witnesses he thought might be helpful, a Cynthia Seymon and Amber Nicki Mattingly. I had not been aware of those witnesses prior to yesterday about this time.
>
> After we recessed last night, I did speak over the telephone with Ms. Seymon. I have both a home phone and a cell phone number for her. I got her on her cell phone after trying her home phone. I indicated to her that I might need her testimony and I might also need the testimony of Amber Nicki Mattingly. Ms. Seymon said she would speak with Ms. Mattingly and be able or willing to respond to me this morning, so I told her I would call her between 8:30 and 8:45.
>
> I did place a call to each of the numbers I had for Ms. Seymon and got an answering machine on each number, asked her to call me as soon as possible and also asked her to speak with my secretary if I was in court. I did not get a call back, my secretary did not get a call back this morning[.] I tried approximately an hour right after the noon recess to call her at each number and again got the answering machine."

¶ 21    At this impasse, Smith proposed a plan. If, by the time the State finished its case that day, Smith had not heard from Cynthia Seymon or Amber Mattingly, Smith would request that the circuit court recess the case until the first thing the next morning so that Smith could make another attempt to locate those two witnesses and to subpoena them, if necessary—with the understanding that this would be the last continuance. The prosecutor and the court were favorably disposed toward that plan.

¶ 22    The next day, on June 14, 2006, after the State rested, Smith gave a final update on the Seymon and Mattingly situation. He noted that, for the last 2½ days, he had left a number of telephone messages for Cynthia Seymon but had been unable to persuade her to answer her telephone. Smith continued:

"I did, however, notice yesterday that Ms. Mattingly was supposed to be in court on the third floor in a traffic matter today and with the assistance from another lawyer in our office, we did find her and she is in fact in the courtroom at this moment. I did speak with her and showed her a copy of [d]efendant's [exhibit] No. 1 and she told me that she did not see Mr. Hansen sign that document and therefore could not verify the genuineness of his signature.

After discussing that information with [defendant], he was concerned that perhaps she felt pressured or reluctant because of some outside pressure to testify. I did speak with her again and she assured me he [*sic*] was under no pressure and all I told her was all I wanted was the truth and she told me that the truth was that while she apparently was the one who brought the copy of [d]efendant's [exhibit] No. 1 to my office, she had not seen Mr. Hansen sign it. So since neither she nor Ms. Seymon, according to what they told, can't [*sic*] testify to the genuineness of Mr. Hansen's signature on that document, I would not be intending to call either one as a witness. That would be the only purpose for which they could be useful and prepared to testify to the genuineness of Mr. Hansen's signature."

¶ 23    Also, Smith reported on his investigation of a third potential witness. The day before, defendant had informed Smith of a man in jail, William Taylor, "who had told [defendant] that he had done some drugs with Nathan Hansen some time after February 15th, 2006, *** apparently recently." During a recess the day before (as Smith informed the circuit court), he spoke with Taylor's attorney, Terry Dodds, requesting permission to interview Taylor and possibly to call him as a witness. Dodds had responded "that, number one, he was not going to authorize [Smith] to speak with Mr. Taylor, and, number two, if Mr. Taylor were called as a witness, he would advise Mr. Taylor to invoke his Fifth Amendment rights not to testify." Therefore, Smith did not plan to call Taylor as a witness. Doing so would "be an exercise in futility."

¶ 24    Finally, Smith informed the circuit court, defendant had chosen not to testify. After admonishing defendant and confirming that this was indeed his decision, the court asked Smith, "[B]ased upon that issue having also been addressed, there would be no evidence presented by the defense?" Smith answered, "That's correct, [Y]our Honor."

¶ 25             C. The *Pro Se* Amended Petition for Postconviction Relief

¶ 26    In his *pro se* amended petition, defendant claimed that he was innocent and that Smith had rendered ineffective assistance by failing to investigate, interview, and subpoena four alibi witnesses: Lenette Hunt, Nicole Hale, Cynthia Seymon, and Lydia Coe. Defendant incorporated affidavits by these witnesses into his amended petition. We quote from the amended petition: "The defendant has attached to his *Pro Se* Petition affidavits from witnesses Lenette Hunt, Nicole Hale, Cynthia Seymon, and Lydia Coe, which affidavits are incorporated by reference into his Amended Petition. These affidavits form[ ] the basis for a compelling alibi defense and a factual innocence claim." Thus, defendant adopted, as his own averments, the averments of the alibi witnesses. As he put it, he "plead[ed] the facts contained in the affidavits."

¶ 27    Lenette Hunt represented in her affidavit of July 7, 2009, that defendant "was in Chicago from the 13th to the 19th of February 2006 visiting [her] and [her] grandmother for Valentine[']s Day."

¶ 28    Nicole Hale represented in her undated affidavit "that on the 13th through the 19th day of February 2006, [she], Nicole Hale, and [defendant were] in Chicago visiting his family for the week of Valentine's Day when this allege[d] incident [was] suppose[d] to have occurred on the 15th day of February 2006." Hale further represented that she had left a message with Tracy Smith's secretary but that Smith had never returned her call.

¶ 29    Cynthia Seymon's affidavit was dated July 7, 2009, and it represented as follows:

"From February 13th [to] 19th of 2006, [defendant] was in Chicago for the entire week visiting his family. I am 100% sure that [defendant] was in Chicago from these dates because I myself was in Chicago when I came across him and knew he was going to Chicago at this time and I am willing to testify to this sworn statement."

¶ 30    In her affidavit of July 7, 2009, Lydia Coe represented, "[Defendant] was not in Bloomington but was in Chicago the whole week from February 13 to *** 19[,] 2006[,] visiting me[,] his grandmother[,] and [his] sister."

¶ 31    Also, the record includes an undated affidavit by Nina Seymon, who avers that defendant was in Chicago on February 15, 2006, and that, had defendant's attorney contacted her, she could have so testified.

¶ 32                    D. Evidence in the Postconviction Proceedings

¶ 33    Partly because of a remand ordered by the appellate court (see *People v. Coe*, 2013 IL App (4th) 110459-U, ¶¶ 5, 88), there were several evidentiary hearings, spread out over years, on defendant's amended petition for postconviction relief. Some of the hearings were in 2010 and 2011. Then there was another hearing, on remand, in 2019.

¶ 34                    1. *The Evidentiary Hearings in 2010 and 2011*
¶ 35                    a. The Testimony of Lydia Eileen Coe

¶ 36    Lydia Eileen Coe is defendant's mother. She testified that in February 2006 she lived with her parents at 4753 South Indiana Avenue in Chicago, where, every Valentine's Day (February 14), by family tradition, there was a get-together. Her mother would cook a big meal, and family members would come over and visit. Valentine's Day in 2006 stood out in Lydia's memory because her mother, who was in poor health, prepared a large feast and no one showed up that day. Instead, the guests arrived the morning after, on February 15, 2006. They were defendant and his girlfriend, Nicki (presumably, Amber Nicki Mattingly); Lydia's youngest daughter, Lenette Turner (née Hunt), and her boyfriend (name unspecified); Lydia's daughter (name unspecified) who lived in Bloomington, Illinois, and her children (names unspecified); and Lydia's brother (name unspecified) and his children (names unspecified). The adults received a dressing down from Lydia for standing her mother up the day before.

¶ 37    Aside from this unpleasantness, some circumstances of a more lighthearted nature made the day memorable for Lydia. Defendant brought her a jar of gummy bears, and he arrived in a green rental car that was comically ugly. His sister, Lenette, teased him about the unsightly car, and everyone had a good time. Some of the guests were drinking. They were all "kicking."

¶ 38    Lydia testified that, around 4 p.m. on February 15, 2006, she and her boyfriend, named Buddy (last name unspecified), left the party at her mother's house and set out with Lydia's sister Cynthia Seymon to Bloomington, Illinois, where a birthday party for Lydia's other sister, Patricia (last name unspecified), was to take place. The plan was that the family get-together

would be transferred from Lydia's mother's house in Chicago to Patricia's house in Bloomington. Lydia and her boyfriend were the first ones to leave her mother's house. When they left, defendant was still there, in his grandmother's house.

¶ 39　　Defendant (who was representing himself in this hearing) asked Lydia:

"Q. Did the defendant's attorney, Trey [*sic*] Smith, ever contact you?

A. Nobody never contact me.

Q. And had you been contacted by Mr. Smith, would you have been able to testify?

A. Yes, I would have.

Q. And had you been contacted by Mr. Smith[,] would you have been able to testify that [defendant] was in Chicago on February 15th, 2006, at his jury trial?

A. Yes, if he would have contacted me. But no one never contacted me."

Likewise, on cross-examination, the prosecutor asked Lydia:

"Q. No one ever contacted you about testifying on behalf of your son?

A. No. No, sir."

¶ 40　　On the other hand, when later questioned by the circuit court, Lydia testified that defendant had contacted her about testifying in his trial. The court asked Lydia:

"THE COURT: [Y]ou do recall receiving a letter or perhaps more than one letter from your son where he requested you to testify as a witness at his trial in June 2006; is that correct?

THE WITNESS: Yes, Your Honor.

THE COURT: But your response to him was that you would not?"

¶ 41　　Lydia answered that she had indeed turned down defendant's request to testify in his jury trial. Although the circuit court did not ask Lydia for an explanation, she gave one. She explained that, "[t]wo days" after the get-together in Chicago—that is, two days after February 15, 2006—she "came up here to Bloomington" because her sister Patricia's birthday was on February 19, 2006. Defendant also returned to Bloomington, and Lydia wanted to see him. As she testified:

"I wanted to spend time with my son over at a lady named T.T.'s house. Well, we went in there and we were sitting down. My son was not there. Him and Nicki were gone. So I sat there with them, me and the young lady, T.T. About 15 minutes later, the police came in there, in her house."

The police stopped Lydia as she was on her way to the bathroom, and they confiscated the money in her pocket, claiming that "[her] money was hot." Then the police took Lydia to the police station, where she sat for eight hours. The police coerced defendant into turning himself in, warning him that, unless he did so, they would lock up his mother. Lydia explained, "And that's why I don't want to come up here, and that's why I didn't want to come to his trial." Defendant was "an all right child," but Lydia would not come to Bloomington willingly and be subjected to such mistreatment again.

¶ 42　　On redirect examination, Lydia agreed that, if she had been subpoenaed, she would have come to Bloomington and would have testified in the jury trial—just as she had come to the present postconviction hearing in obedience to a subpoena.

¶ 43                                    b. The Testimony of Cynthia Seymon

¶ 44        Defendant's aunt, Cynthia Seymon, testified that "Lenette Hunt" (defendant's sister) "usually cook[ed] on Valentine's Day" but that 2006 was unusual in that "no one came that day and we all went the next day." (This was in contrast to Lydia Coe's testimony that it was their mother who did the cooking.) Cynthia had a definite recollection of being in Chicago on February 15, 2006, because, the day before, on Valentine's Day, she checked into Sunset Suites in Clinton, Illinois, and she headed directly to Chicago the day after. She remembered seeing defendant in Chicago while she was there. What stuck in her mind was that defendant was with a woman named Nicki and that defendant was picking up some clothing from Poo's house. (Lydia had testified that Poo was Lenette's nickname.) Beyond that, Cynthia did not remember much, and for that reason, she insisted that she was "just not a credible witness." She remembered seeing defendant in Chicago, but she could not remember whether it was on February 15, 2006, that she saw him.

¶ 45        Defendant asked Cynthia if trial counsel, Smith, had contacted her about testifying in the June 2006 trial. Cynthia answered:

> "A. I remember talking to him, definitely, clearly about it, and I remember me supposing to go[,] but like I just said, I remember I neglected to meet him. I remember that. I neglected to meet him, but I remember him contacting me about it. Yes, I do."

¶ 46        Defendant asked Cynthia if Smith had subpoenaed her:

> "Q. Do you remember being subpoenaed for your nephew's June 2006 jury trial by Mr. Smith his attorney?
>
> A. Yes, I do.
>
> Q. Do you remember getting any type of subpoenas?
>
> A. The same thing that happened this time. They should have received it back because I never responded to the subpoena, but I remember that they were looking for me to come on the stand. But like I said, I was gone. I was going through some things myself and I could not appear.
>
> Q. Okay. Just to be clear, you remember being subpoenaed in 2006 to come to your nephew's trial?
>
> A. Yes, I do."

¶ 47        When presented with her affidavit, Cynthia Seymon recognized her signature, but the rest of the affidavit was unfamiliar to her.


¶ 48                                    c. The Testimony of Nina Seymon

¶ 49        Nina Seymon testified that she was at her grandmother's house in Chicago on February 15, 2006, and that defendant—her cousin, a "good dude" whom she "love[d]"—also was there that day. The other guests were Nina's grandparents; her boys, Eric and Michael (last names unspecified); a friend of hers, Tiffany Young; her aunt Lydia Coe; and her cousin Dante Coe. Nina could not remember what day of the week February 15, 2006, was or exactly when she arrived at her grandmother's house. It was dark when she arrived, so she estimated that it was 4 or 5 p.m. She was unsure, but she thought that defendant was already at her grandmother's when she arrived. She left at 9 or 10 p.m. because she went out that night. She did not recall when defendant left.

¶ 50    Defendant had requested Nina to testify in his jury trial. Defendant's attorney, however, never contacted Nina and never subpoenaed her.

¶ 51    On cross-examination, Nina admitted that she "maybe" had been convicted of retail theft at least two times and that she also had been convicted of mob action.

¶ 52                    d. The Testimony of Sheila Harris

¶ 53    Defendant was unrelated to Sheila Harris, but she characterized him as being "like a big brother" to her. He did not reside with her, but he and his girlfriend, "Nickie" (usually spelled in the record as Nicki), were in Harris's home briefly at 9 a.m. on February 15, 2006. Then they left for Chicago in a rented car. Harris did not see the rented car. Defendant, however, did not own a vehicle of his own, and he had talked that week about renting a car. He got in a minor accident in the rental car.

¶ 54    Around 7 p.m. on February 15, 2006, while defendant was away, uniformed police officers arrived at Harris's residence. Harris knew Nathan Hansen, a.k.a. Little Nate, and he was not at her residence on February 15, 2006. She denied that defendant sold any drugs out of her residence that day.

¶ 55    Around 9 p.m. on February 15, 2006, defendant returned to Harris's residence. She was home all day and never saw him between the hours of 9 a.m. and 9 p.m.

¶ 56    No one ever contacted Harris about testifying in defendant's June 2006 jury trial.

¶ 57    Harris admitted that she was serving a sentence of imprisonment for a 2009 conviction of manufacturing or delivering a controlled substance.

¶ 58                    e. The Testimony of Michael Magaña

¶ 59    According to Michael Magaña's testimony, he met defendant "around 2004" at a house party in Streator, Illinois, where Magaña lived at the time. Magaña testified, "I met him through some girls in my town of Streator, Illinois."

¶ 60    On February 15, 2006, the day after Valentine's Day, Magaña was "kicking it" with a man nicknamed Rio, whom Magaña had met "through this girl [whom Magaña] kn[e]w from La Salle County." Magaña knew this woman only by her nickname, Pebbles, just as he knew Rio only by his nickname. On February 15, 2006, between 1 and 5 p.m., Magaña was with Rio, "partying" at the house of "some lady" named TT whom Magaña had never met. TT was not home, and Magaña and Rio never went inside her house that day. Instead, they just sat on TT's back porch, smoking a blunt that Magaña had brought along.

¶ 61    A white man of about Magaña's height whom Magaña knew as Little Nate came walking up the driveway of TT's house. "[F]rom hanging around with Rio," Magaña was acquainted with Little Nate because Little Nate was a "faithful customer[ ]" of Rio's and had "a lot of money." Rio came down from the porch and talked with Little Nate, who said that he had a couple hundred dollars and asked, " '[C]an you get me some?['] " " ['Y]eah, I got you,['] " Rio replied. Rio then went into TT's backyard and came back with a Baggie, a transparent plastic bag, in which Magaña could see pieces of aluminum foil. Little Nate gave Rio the cash, and Rio gave him the Baggie. When Rio returned to the porch, he told Magaña that what he had sold to Little Nate was crack cocaine.

¶ 62    Sometime in the middle of April 2006, Magaña telephoned the secretary of defendant's attorney, Tracy Smith, because he had heard from a woman named November (whose full

name Magaña did not know) that defendant had been "arrested for something he didn't even do." Magaña explained to the secretary that he was a witness to the transaction in question and that defendant was not there when the sale was made. He gave the secretary his address and cell phone number. In May 2006, however, Magaña was incarcerated, and his cell phone was confiscated. He doubted that his mail was forwarded. He thought, in retrospect, that he should have given the secretary his father's address. Defendant's attorney never contacted Magaña.

¶ 63　　On cross-examination, Magaña admitted that he currently was incarcerated for a 2008 conviction of retail theft. He also admitted having a 2008 conviction of aggravated battery, a 2009 conviction of burglary, and a 2006 conviction of forgery. He had come into contact with defendant in the correctional facility in Pontiac, Illinois.

¶ 64　　　　　　　　　　　f. The Testimony of Tracy Smith

¶ 65　　Tracy Smith remembered representing defendant in this case, but his memory was hazy. He thought that defendant had given him the names of two alibi witnesses, his mother and his aunt. The names Lydia Coe and Cynthia Seymon sounded familiar. Smith believed that he had spoken with them on the telephone only to learn that they were unable to confirm that defendant was in Chicago on Wednesday, February 15, 2006. They would have been able to testify that he was in Chicago during the weekend before February 15, 2006, but it was their recollection that he left Chicago the following Monday. Consequently, they would have been unable to vouch for where he was the rest of the week, including on Wednesday, when the offense was committed.

¶ 66　　After his memory was refreshed by the transcript of the jury trial, Smith remembered that defendant additionally gave him the name of William Taylor. Smith recalled speaking with Taylor's attorney, who had denied Smith permission to speak with Taylor. Smith had felt ethically obligated to respect that refusal.

¶ 67　　Smith conceded the possibility that defendant had given him additional names. It could be, Smith admitted, that years later—and hundreds of cases later—he just could not remember all the names of potential alibi witnesses that defendant had given him. Smith testified, however, that he would have attempted to contact any alibi witnesses that defendant disclosed to him. That was what he did for every client.

¶ 68　　　　　　　　　　　g. Defendant's Testimony

¶ 69　　Defendant testified that, before his June 2006 jury trial, he disclosed to Smith the following alibi witnesses, giving Smith their names, addresses, and telephone numbers: Nina Seymon, Lydia Coe, Sheila Harris, Nicole Hale, and Dennis Compton. Defendant testified, however, that he did *not* disclose to Smith the following witnesses: Michael Magaña, Lenette Hunt, and Cynthia Seymon. To quote from defendant's testimony:

> "I'm testifying to the fact that prior, before my June, 2006, jury trial, I had disclosed witnesses to trial counsel, Mr. Tracy A. Smith, Nina Seymon, Lydia Coe, Sheila Harris, Nicole Hale, Dennis Compton, *not* Michael [Magaña], Lenette Hunt, Cynthia Seymon, and prior to disclosing these witnesses to trial counsel, Tracy Smith, I told him that they could have testified to my alibi defense surrounding [the] February 15, 2006, delivery that I was charged and convicted and sentenced, and Mr. Smith was aware of

the testimony of all these witnesses, was disclosed the addresses and telephone numbers to contact these witnesses." (Emphasis added.)

¶ 70    Although Smith assured defendant that he would contact the alibi witnesses, Smith must have "failed to do so because no witnesses were presented" on behalf of the defense.

¶ 71                        2. *The Evidentiary Hearing in 2019*
¶ 72                           a. Defendant's Testimony
¶ 73                  i. *The Alibi Witnesses Whom He Disclosed to Smith*
¶ 74    Defendant testified that, soon after his arraignment, he sent Smith a letter listing the names, addresses, and phone numbers of alibi witnesses: witnesses who would testify that, on February 15, 2006, defendant was in Chicago instead of in Bloomington. The alibi witnesses whom defendant identified for Smith were the following: defendant's mother, Lydia Coe; his aunt, "Cynthia Ramone"; defendant's cousin, "Nina Simmons"; his sister, Lenette Hunt; his grandmother, Tylida Hunt, who now was deceased; Sheila Harris; Dennis Compton; and "Michael McGanna." (Elsewhere in the record, defendant has an aunt named Cynthia Seymon, a cousin named Nina Seymon, and an acquaintance named Michael Magaña, who, judging by his affidavit, spells his name with a tilde over the n. In this 2019 hearing, however, defendant spelled out his aunt's name as "R-A-M-O-N-E." It is unclear whether Cynthia Seymon and Cynthia Ramone are the same person.) Smith never subpoenaed any of those witnesses, and Smith never raised an alibi defense in the June 2006 jury trial.

¶ 75                    ii. *Defendant's Account of Where He Was and*
                              *What He Did on February 14 and 15, 2006*
¶ 76    Defendant testified that early in the morning on February 14, 2006, he left Bloomington in a rental car and that at about 10 a.m. that day he arrived at his grandmother's house, 4743 South Indiana Avenue, in Chicago. He stayed in his grandmother's house for 1½ to 2 hours and then drove to his sister Lenette Hunt's house, which also was in Chicago. He remained in his sister's house pretty much the whole day on February 14, 2006, and stayed overnight there. The next day, on February 15, 2006, he went back and forth between his grandmother's house and his sister's house and also visited an uncle. At 9 p.m. on February 15, 2006, defendant left Chicago, heading back to Bloomington. Defendant "was in a relationship with a young lady, Amber Mattingly," and "[s]he went with [him] when [he] drove to Chicago and left at 9 o'clock on the 15th." He and Mattingly arrived at Bloomington around 11 p.m. on February 15, 2006.

¶ 77    According to defendant's testimony, he explained all those details to Tracy Smith before the 2006 jury trial. Not only that, but he gave Smith the witnesses' names and contact information. Smith, however, called no witnesses in the jury trial.

¶ 78    Postconviction counsel (defendant now was represented) asked defendant:

"Q. Did you ask [Smith] during the trial about why there was no alibi defense?

A. Yeah. Actually, girl—my then girlfriend at the time who was in the courtroom. I actually looked over at Tracy Smith and told him my then girlfriend was in the courtroom and she probably wants to come testify on my behalf as far as [an] alibi defense. He took her outside the courtroom. I'm sure it's in the trial record. And came back into the courtroom and told the [j]udge that he spoke with my then girlfriend at the time and he basically said he told her, you know, she can get in trouble if she gets

up there if she lying about anything. So, I think that kind of scared her away from taking the stand although she didn't have no reason to be scared to testifying truthful on my behalf. She elected not to testify.

MS. LIN [(PROSECUTOR)]: Your Honor, I object to the speculative part of that answer.

[DEFENDANT]: That's of record.

THE COURT: Okay. In terms of why she did what she did, the [c]ourt will sustain the objection as to that. That goes to her state of mind at the time."

¶ 79 On Smith's advice, defendant chose not to testify in his June 2006 jury trial. Smith had warned defendant that, if he took the stand, the State could impeach him with his criminal record.

¶ 80                          b. Lydia Darleen Coe's Testimony

¶ 81                     i. *The Exonerating Photographs, Now Lost*

¶ 82 Lydia Darlene Coe testified that she was living at 4753 South Indiana Avenue in Chicago when she received a call from a man telling her that her son, defendant, had been arrested on drug charges and that defendant needed her to be a witness. (According to the transcript of a previous hearing, she testified that her name was Lydia Eileen Coe. The discrepancy is unexplained.) Lydia told the man that defendant was in Chicago at the time of the alleged drug offense. The man asked her if she could bring proof. When Lydia came to Bloomington and met with the man, who was representing defendant, she brought along three photographs showing that defendant was in Chicago on the day in question. She gave the photographs to the man. She had no copies of the photographs.

¶ 83 On cross-examination, the prosecutor asked Lydia what year it was, 2006 or 2011, when Lydia met with the man. She answered that it was 2011 and that Walgreens, which had developed the photographs, had printed the date on the back of the photographs. She gave these photographs to the man representing her son and never heard from the man again. She called the man's telephone number to try to get her photographs back, but the phone only rang and rang. Eventually, when she tried calling again, she received a message that the telephone number no longer was in service.

¶ 84                 ii. *Her Account of What Happened on February 14 and 15, 2006*

¶ 85 On Valentine's Day, February 14, 2006, Lydia was living with her mother and father at 4753 South Indiana Avenue in Chicago. That day, Lydia's sisters, Pat and Cynthia, came over, as well as her brothers and a lot of nieces and nephews. Lydia was helping her mother in the kitchen when, to Lydia's shock, defendant arrived with a woman who was not black. Lydia was indignant upon learning that defendant had bought this new girlfriend of his a ring. Lydia had felt slighted. All that defendant had bought his mother for Valentine's Day was "a bear."

¶ 86 Defendant was at his grandparents' house until later in the evening on February 14, 2006. Because his sister Lenette had not shown up yet, defendant and a couple of family members left and went to Lenette's house.

¶ 87 The next day, on February 15, 2006, Lydia saw defendant for maybe 20 or 30 minutes. He pulled up in a car, and Lenette was in the car with him. They were on their way to the Ford

City Mall. Around 3 or 4 o'clock, they returned, and Lenette had hundred-dollar gym shoes on her feet. Lydia did not see defendant afterward on February 15, 2006.

¶ 88 Postconviction counsel asked Lydia:

"Q. Were you expecting a phone call from someone in 2006 about where [defendant] was on this?

A. Yes, I was.

Q. And you never got that phone call?

A. No, I didn't.

Q. And you were expecting that call because you talked—

A. I was expecting a call because when they said he was arrested, I really got upset because I said why they keep arresting him? He was here."

¶ 89                                  c. The Testimony of Lenette Turner (Née Hunt)

¶ 90 Lenette Turner (née Hunt) testified that in the morning of February 14, 2006, sometime after 8 a.m., she was home at 309 East 59th Street in Chicago when she received a telephone call from defendant, her brother. He wanted to visit with her. The rest of that day and overnight, defendant and his girlfriend, Amber, stayed with Turner in her residence. Defendant and Turner had not seen one another in years.

¶ 91 The next morning, on February 15, 2006, they woke up and got dressed. They had breakfast at Ford City Mall, where Turner bought some tennis shoes.

¶ 92 After going to the mall, the three of them went to 4753 South Indiana Avenue to visit with defendant's and Turner's relatives. After eating and talking, they left, and defendant dropped Turner off at her residence. He was driving a rental car. It was dark out—it must have been 8:30 or 9 p.m.—when he dropped Turner off at her home. Then defendant headed back to Bloomington.

¶ 93 Soon afterward, a cousin telephoned Turner and told her that defendant was in jail. Defendant likewise telephoned Turner and let her know that he was in jail. Turner was expecting to receive a call to testify in defendant's jury trial, but she never heard from defendant's attorney. She never received a call to come to the jury trial and testify. The case went to trial in June 2006, and she never knew about it.

¶ 94 On cross-examination, Turner testified that she never received a call about testifying in 2011 either. She would have been unable to attend anyway because at that time "[she] was on papers [herself]."

¶ 95                                  d. The Testimony of Tracy Smith

¶ 96 Tracy Smith believed that he represented defendant years ago, but his recollection was fuzzy at best. He seemed to recall being given the telephone numbers of two women in Chicago. When he telephoned them, they could confirm that defendant was in Chicago the weekend before the offense but were unable to confirm that he was in Chicago after Monday. Smith vaguely recalled that, on the day of the trial, defendant mentioned a couple of people, one of whom was in jail. The defense attorney of the jailed man denied Smith permission to talk with the jailed man. If defendant had given Smith any names of potential witnesses, Smith would have followed up with them. Smith did not remember anyone's telling him that an

individual by the name of Rio had committed the offense with which defendant was charged. But Smith could not remember much about the case.

¶ 97                                E. The Circuit Court's Decision

¶ 98        In its order of February 26, 2020, the circuit court stated that it had reviewed the entirety of defendant's three-volume file, his amended postconviction petition, the affidavits, the transcripts of the prior evidentiary hearing, and the testimony in the latest evidentiary hearing, that is, the one held on remand.

¶ 99        After reviewing those materials, the circuit court found the claim of actual innocence to be unproven. The court was unconvinced that Brian "Rio" Smith, as opposed to defendant, was the person who delivered the controlled substance to Hansen on February 15, 2006.

¶ 100       The circuit court also found the claim of ineffective assistance to be unproven. The reason, basically, was that the court found Smith to be credible and most of defendant's witnesses to be less than credible. The court believed that there was a regular Valentine's Day gathering that defendant attended at some point in 2006. But the court questioned that the gathering took place on Wednesday, February 15, 2006, as opposed to the preceding Saturday, Sunday, or Monday. The court found Lydia Coe and Lenette Turner "to be somewhat vague on the specific dates." Nina Seymon "did not know which day of the week February 15, 2006[,] was on[,] and there [was] no credible evidence that [defendant] gave Mr. Smith her name." The court found neither Harris nor Magaña to be credible.

¶ 101       The circuit court continued:

        "32. [Defendant] testified to numerous witnesses who could testify to an alibi. He stated he provided the names and addresses of these witnesses. In fact, two witnesses allegedly appeared ready to testify at trial. Yet, no witnesses testified on [defendant's] behalf. It is difficult for the [c]ourt to accept that any [d]efendant, especially one who appears to have a high degree of competency such as [defendant], would have eight alibi witnesses other than himself and not call it to the [c]ourt's attention that none of them were being called as a witness in his trial. [Defendant's] conviction was reviewed on appeal[,] yet [defendant] did not raise the alibi issue despite allegedly having eight witnesses who could say he was in Chicago. The [c]ourt finds [defendant's] testimony is not credible that he let Mr. Smith know of these witnesses and their contact information and he did not follow through. Further, even if these witnesses would have testified[,] their testimony presented conflicting testimony at best. The [c]ourt does not find a reasonable probability that the result at trial would have been different."

Therefore, the circuit court denied defendant's amended petition for postconviction relief.

¶ 102       On March 9, 2020, defendant moved for reconsideration.

¶ 103       On May 13, 2020, the circuit court denied defendant's motion for reconsideration.

¶ 104       On May 19, 2020, defendant appealed from the order denying his motion for reconsideration.

¶ 105                                II. ANALYSIS

¶ 106       In an evidentiary hearing on a postconviction petition, the defendant has the burden of proving, by a preponderance of the evidence, a substantial violation of a constitutional right. *People v. Coleman*, 2013 IL 113307, ¶ 92. To decide whether the defendant has carried that

burden, the circuit court, as the trier of fact, must make credibility determinations and must weigh the evidence. *People v. Reed*, 2020 IL 124940, ¶ 51. On appeal, we will not do the circuit court's job over again. We will not reassess the credibility of the witnesses. Nor will we reweigh the evidence. Instead, we will decide whether the circuit court's decision was manifestly erroneous. *Id.* A manifest error is an error that is "clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *Id.* In other words, a decision is manifestly erroneous only if it is beyond reasonable dispute that the trier of fact should have reached the opposite decision. See *Coleman*, 2013 IL 113307, ¶ 98.

¶ 107    Defendant contends that, for four reasons, the denial of his amended petition for postconviction relief was manifestly erroneous. Let us take his reasons one at a time.

¶ 108                           A. The Haziness of Smith's Memory and His
                              Testimony as to What He Would Have Done

¶ 109    In both his testimony in 2011 and his testimony in 2019, Smith admitted that he did not remember much about defendant's case. He testified, however, that if defendant had informed him of alibi witnesses, he, Smith, would have tried to contact all of those witnesses. The circuit court "[found] Mr. Smith credible that[,] if a valid alibi defense would have been presented to him[,] he would have pursued it."

¶ 110    Defendant challenges this finding. He argues that what Smith "hypothetically 'would have done' in this case" is mere "speculation" and "is irrelevant to the question of what he *actually* did in this case." (Emphasis in original.)

¶ 111    Speculation is guesswork, a conclusion reached on insufficient evidence. It does not ring true to describe Smith as *guessing* that he would have investigated all of the alibi witnesses of which he was aware. He had knowledge of his own values and practices as a defense attorney. On the basis of that knowledge, he inferred that he would have tried to contact all the alibi witnesses that defendant had disclosed to him. If Smith were to be believed, he had a basis for this inference that he drew.

¶ 112    Similarly, a lifeguard might not be able to remember each of the hundreds of people who swam in a pool several summers ago. The lifeguard, however, would remember what kind of person he or she was several summers ago. Knowing his or her own morals, habits, and sense of duty at that time, the lifeguard could validly draw an inference. The lifeguard would not be *speculating* if he or she were to say, "If I had heard a swimmer cry out for help, I would have come to his or her aid." Nor would the lifeguard's statement be *irrelevant* to the question of whether, several summers ago, the lifeguard ignored a drowning swimmer.

¶ 113    Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). If in 2006 it was Smith's professional ethos and practice to try to contact each potential alibi witness, that fact would have *some* tendency to make it more probable than it otherwise would be that in 2006 Smith tried to contact each alibi witness whom defendant had identified for him. See *id.* Smith's account of his own ethical standard to which he faithfully adhered obviously was beneficial to himself—but that need not prevent a reasonable trier of fact from believing his account.

¶ 114    According to defendant, "the [circuit] court's erroneous finding that these general practices inform what Smith hypothetically could have done in this case echoes the improper findings

- 15 -

of the circuit court following the 2011 evidentiary hearing." This comparison is invalid. In *Coe*, 2013 IL App (4th) 110459-U, ¶ 67, we held that the circuit court had erred by relying on its *extrajudicial* knowledge of Smith's performance in *other* cases. That is not what the circuit court did this time. Rather, the circuit court relied on Smith's testimony in the present case, including his account of what he would have done had his client disclosed an alibi witness to him. The court relied on evidence adduced in the present case—which is exactly what a trier of fact is supposed to do.

¶ 115                                B. Vagueness on Specific Dates

¶ 116    The circuit court believed Lydia Coe "that there [was] a regular Valentine's gathering for the family and that [defendant] did attend at some point in 2006." The court, however, questioned whether the gathering took place on Wednesday as opposed to the preceding Saturday, Sunday, or Monday. Also, the court found Lydia Coe's testimony and Lenette Turner's testimony "to be somewhat vague on the specific dates." Defendant challenges this finding of vagueness as being manifestly erroneous.

¶ 117    When it came to Lydia Coe's shifting accounts, "somewhat vague" was too kind. "Self-contradictory" would be more apt. On the one hand, in the 2011 hearing, she testified that the Valentine's Day gathering took place the day after Valentine's Day, on February 15, 2006:

> "My mom cooked on the 14th which we always do. It's a tradition with the family. Mom cooks, everybody comes over. The reason I remember that day so well is because didn't no nobody show up and my mom went to a lot of trouble of cooking all that food. Everybody came over the day after."

¶ 118    On the other hand, in the 2019 hearing, Lydia Coe testified that the Valentine's Day gathering took place on Valentine's Day, February 14, 2006. Defense counsel asked her:

> "Q. Okay. And that, in fact, was Valentine's Day 2006, February 14th?
>
> A. Yes, it was.
>
> Q. Who else came over to the house *that day*?
>
> A. Well, it was my sister Pat, my sister Cynthia, a lot of my nieces and nephews, my cousins, my brothers.
>
> Q. Okay. So there were a lot of people?
>
> A. Yeah. We always—as I said, we always gathered around the house. This is something we do now.
>
> Q. Do you recall [defendant's] being there?
>
> A. [Defendant]? [Defendant] came in." (Emphasis added.)

¶ 119    Not only was Lydia Coe's 2019 testimony inconsistent with her 2011 testimony, but her 2019 testimony and her 2011 testimony both were inconsistent with her affidavit. On the one hand, in her affidavit of July 7, 2009, she represented, "[Defendant] was in Chicago the whole week from February 13 to *** 19[,] 2006[,] visiting me[,] his grandmother[,] and [his] sister." On the other hand, in the 2011 hearing, she testified that she left Chicago on February 15, 2006, and that on February 17, 2006 (two days after the gathering in Chicago), she was in TT's house, in Bloomington, waiting for defendant to drop by because he had returned to Bloomington and she wanted to visit with him. In the 2019 hearing, Lydia Coe testified that she did not see defendant after 4 o'clock on February 15, 2006—which is hard to square with her affidavit that he was visiting her in Chicago the whole week, until February 19, 2006.

- 16 -

¶ 120 We agree with defendant that Lenette Hunt, in her testimony, showed no vagueness as to dates. (It is unclear, however, how she could have sworn in her affidavit that defendant was in Chicago from February 13 to 19, 2006, if, according to her testimony, he did not telephone her until February 14, 2006.) Cynthia Seymon, by contrast, stated with "100%" certainty in her affidavit that defendant was in Chicago from February 13 to 19, 2006, whereas in her testimony she could not remember when, exactly, defendant was in Chicago.

¶ 121 Nina Simmons, for all her felonies, at least displayed the virtue of self-consistency. Unlike some of defendant's witnesses—including defendant himself—she did not first assert one time period under oath and then withdraw or revise her assertion. It could be reasonably questioned, though, how certain Simmons really was about defendant's being with her in Chicago on a specific date some 13 years ago—February 15, 2006—if she was unable to say what day of the week that February 15, 2006, was.

¶ 122 This detail, by the way, deserved some attention and explanation. It could strike a reasonable trier of fact as strange and implausible—and did strike the circuit court as strange and implausible—that a major family gathering would be held in the middle of the week, on a Wednesday (February 15, 2006), considering that most working-age people have to work and that most school-age children have to go to school, during the week. Seemingly, it would have made more sense to have the family gathering the weekend before—and, therefore, one might suspect, the family gathering did in fact occur the weekend before, as Smith seemed to recall from his telephone conversation with some of defendant's relatives.

¶ 123 C. Saying Nothing in the Original Circuit Court
Proceedings or on Direct Appeal

¶ 124 To the circuit court, it also seemed implausible that any defendant, especially someone with defendant's "high degree of competency, would have eight alibi witnesses other than himself and not call it to the [c]ourt's attention that none of them were being called as a witness in his trial." Nor, the court noted, did defendant "raise the alibi issue" on direct appeal. Largely because of that sustained silence, the court disbelieved defendant's testimony "that he let Mr. Smith know of these witnesses and their contact information and [that Mr. Smith] did not follow through."

¶ 125 This analysis, in defendant's view, is manifestly erroneous because (1) while represented, he was constrained to speak only through his attorney and (2) the record on direct appeal did not enable appellate counsel to raise the alibi issue in the direct appeal. Defendant explains:

"While [defendant] is an unusually articulate *pro se* advocate, he understands court procedures and has never attempted to improperly subvert his attorneys' authority. When he believes that his representation is deficient, he pursues relief through appropriate channels. As this [c]ourt well knows, the appropriate channel for alleging ineffective assistance based on 'what trial counsel should have done' is through a post-conviction petition supported by affidavits, and that is exactly what he pursued in this case. *People v. Tate*, 2012 IL 112214, ¶ 14. Indeed, [defendant] testified that his appellate attorney explained that it was not possible to raise the alibi defense on direct appeal, since that appeal was restricted to the record made by counsel in the court below."

¶ 126    Defendant is right that, on direct appeal, a litigant can raise only claims that the record substantiates. Since defendant, however—to quote his own words—"understands court procedures," he would have understood his right to file a *pro se* posttrial motion faulting Smith for failing to call alibi witnesses. See *People v. Krankel*, 102 Ill. 2d 181 (1984). We are unaware that defendant filed any such *pro se* motion—although we have come across a *pro se* motion by defendant to fire his postconviction counsel. Our point is this: defendant has never appeared to labor under any inhibitions when he believed that an attorney of his was failing to perform up to par.

¶ 127    Defendant also is right that, under *Tate*, he was perfectly entitled to sit silently and passively like a potted plant as Smith announced to the circuit court his intention to call no witnesses in the jury trial. Smith was perfectly entitled to wait until the postconviction proceeding to complain of Smith's failure to call alibi witnesses. The question, though, is not what defendant was *entitled* to do. Rather, the question is what he likely *would have done*.

¶ 128    Defendant was no potted plant. He demonstrated a readiness to tug on Smith's sleeve when he believed that witnesses could be called—and, equally important, Smith demonstrated a readiness to relay that information from his client to the circuit court. When the prosecutor called into question the authenticity of the purported affidavit by Hansen, defendant acted with promptitude. Right then and there, he informed Smith of two witnesses, Cynthia Seymon and Amber Mattingly, who supposedly could authenticate the affidavit. Smith, at pains to make a record, in turn disclosed those witnesses to the court and the reason why those witnesses might be helpful to the defense. "That would be the only purpose for which [Cynthia Seymon and Amber Mattingly] could be useful," Smith informed the circuit court: "to testify to the genuineness of Mr. Hansen's signature." We see no indication in the record that, hearing Smith so declare, defendant tugged on his sleeve again or set him right.

¶ 129    Defendant, in his testimony in the postconviction proceeding, comes across as retroactively revising the reason why Cynthia Seymon and Amber Mattingly were of interest as potential witnesses. On August 26, 2019, postconviction counsel asked him:

"Q. Did you ask him during the trial about why there was no alibi defense?

A. Yeah. Actually, girl—my then[-]girlfriend at the time who was in the courtroom. I actually looked over at Tracy Smith and told him my then[-]girlfriend was in the courtroom and she probably wants to come testify on my behalf as far as alibi defense."

The then-girlfriend was Amber Mattingly, and judging by Smith's dialogue with the circuit court, calling her as a witness would have had nothing to do with establishing an alibi. It would have had nothing to do with establishing that defendant was in Chicago rather than in Bloomington at the time of the offense. Instead, Mattingly would have been called solely for the reason of authenticating the purported affidavit by Hansen. To believe otherwise—to believe that Mattingly was contemplated as an alibi witness—the circuit court, as the trier of fact in the postconviction proceeding, would have had to believe that Smith had misrepresented to the court the significance of Mattingly that his client had just then communicated to him. The court would have to believe that, with his client sitting right there, Smith had brazenly lied to the court about the substance of the conversation that he had just had with his client.

¶ 130    To deepen the implausibility, the trier of fact would have to believe that Cynthia Seymon and Amber Mattingly perversely kept from Smith the most important exonerating fact. If Cynthia Seymon and Amber Mattingly were, as defendant now claims, alibi witnesses, they surely would have told Smith, "Never mind whether Hansen signed the affidavit; I can

personally attest that defendant was in Chicago on February 15, 2006." Or, alternatively, the trier of fact would have to believe that Cynthia Seymon and Amber Mattingly so informed Smith and that Smith thereafter misrepresented to the circuit court his conversations with them. But why would Smith have done that if he were trying to justify a continuance to obtain their attendance as witnesses? That would have made no sense.

¶ 131    Essentially, the problem with the ineffectiveness claim is this. Smith demonstrated and documented diligence in tracking down witnesses as soon as defendant disclosed them, whereas defendant's account is implausible and self-contradictory. On the one hand, defendant incorporated by reference into his amended petition—he "pleaded"—four affidavits attesting that he was in Chicago from February 13 to 19, 2006. On the other hand, defendant turned around and testified that he left Chicago on February 15, 2006, around 9 p.m. In his amended petition, defendant represented that he had disclosed four alibi witnesses to Smith: Lenette Hunt, Nicole Hale, Cynthia Seymon, and Lydia Coe. In an evidentiary hearing on August 26, 2019, the number of alibi witnesses whom defendant allegedly disclosed to Smith had swelled to eight (eight "at a minimum," as defendant puts it in his brief): Lydia Coe, Cynthia Ramone, Nina Simmons, Lenette Hunt, Tylida Hunt, Sheila Harris, Dennis Compton, and Michael McGanna. In the preceding evidentiary hearing, by contrast, which was held on May 3, 2011, defendant testified that he did "*not* [disclose] Michael [Magaña], Lenette Hunt, [and] Cynthia Seymon." (Emphasis added.)

¶ 132    Like his mother and his aunt, defendant had trouble keeping his story straight. When we add to the implausibility and inconsistencies defendant's two felony drug convictions (one in 2006 and the other in 2000) and his bias in his own favor, we are unable to characterize as manifestly erroneous the circuit court's finding that he was not credible in his testimony. See 735 ILCS 5/8-101 (West 2016); *Knowles v. Panapoulos*, 66 Ill. 2d 585, 589 (1977); *People v. Montgomery*, 47 Ill. 2d 510, 519 (1971).

¶ 133    Granted, Smith was unable to remember much about the case. But the weakness of Smith's memory had no logical tendency to strengthen defendant's credibility. Just because Smith could not remember, it did not necessarily follow that defendant and his witnesses were telling the truth.

¶ 134                    D. Conflicting Testimony by the Alibi Witnesses

¶ 135    The circuit court found that, even if defendant had disclosed alibi witnesses to Smith and even if Smith had unreasonably failed to act on the disclosures, these witnesses would have provided "conflicting testimony at best" and, hence, defendant had suffered no prejudice from the allegedly deficient performance: in other words, there was no "reasonable probability that the result at trial would have been different."

¶ 136    Defendant disagrees. He points out that, to prove prejudice, he need not prove "that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland v. Washington*, 466 U.S. 668, 693 (1984). Instead, all he must prove is a probability sufficient to undermine confidence in the outcome of the case. See *id.* at 693-94. He maintains that "[t]he failure to call six alibi witnesses" (is it six now?) would have sufficiently countered the testimony of Smith—who, by his repeated admission, could remember little—so as to undermine confidence in the outcome of the trial.

¶ 137    We do not reach the question of prejudice. A claim of ineffective assistance of counsel has two elements: (1) counsel's performance fell below an objective standard of reasonableness

and (2) the deficient performance prejudiced defendant. *Id.* at 687. A defendant must prove both elements of *Strickland*, and the failure to prove either element precludes a finding of ineffective assistance. *People v. Houston*, 226 Ill. 2d 135, 144-45 (2007). To find that Smith's performance fell below an objective standard of reasonableness, a trier of fact would have to believe defendant's testimony that he disclosed alibi witnesses to Smith. As we have explained, a trier of fact could reasonably disbelieve defendant's testimony. It is unnecessary, then, for us to evaluate prejudice.

¶ 138                                                        III. CONCLUSION
¶ 139                   For the foregoing reasons, we affirm the circuit court's judgment.

¶ 140                   Affirmed.