2026 IL App (1st) 232296-U

No. 1-23-2296

First Division
March 31, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10 CR 11239 |
| PAWEL DRIADKOWIEC, | ) ) | Honorable Timothy Joseph Joyce |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The dismissal of defendant's postconviction petition is affirmed where he did not make a substantial showing of actual innocence based on newly discovered evidence.

¶ 2    Defendant Pawel Driadkowiec[1] appeals from the second-stage dismissal of his petition for postconviction relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)). Defendant argues that his petition made a substantial showing of actual innocence based on newly discovered evidence in the form of (1) a 2016 study published by Dr. Amanda Fingarson, the State's medical expert at trial, and (2) an opinion from Dr. Joseph Scheller interpreting that study. Accordingly, defendant contends that we should reverse the dismissal of his petition and remand the matter for a third-stage evidentiary hearing. For the reasons that follow, we affirm the dismissal of defendant's petition.

¶ 3                                    I. BACKGROUND

¶ 4    Defendant's conviction in this case stems from injuries sustained by his then-four-month-old son, Szymon, while Szymon was in defendant's care on February 17, 2010. Defendant was charged with attempted murder and aggravated battery involving great bodily harm or permanent disability to a child under 13 years old.

¶ 5    The following evidence was presented at defendant's 2014 bench trial.

¶ 6    Detective Gregory Auguste testified that he was assigned to investigate Szymon's injuries on February 18, 2010. He went to the hospital where he observed Szymon and spoke to the doctors who treated him. Detective Auguste identified various photographs depicting visible injuries Szymon had at that time. Detective Auguste subsequently interviewed defendant several times, both at his home and at the police station. Detective Auguste also interviewed defendant's wife

---

[1] Defendant was prosecuted under the name "Pawel Dziadkowiec," which is apparently the correct spelling of his name. However, his surname is spelled "Driadkowiec" in the postconviction record and on the notice of appeal. We will use "Driadkowiec," the spelling used on the notice of appeal.

(and Szymon's mother) Theresa Driadkowiec, as well as defendant's brother, Maciej Driadkowiec, throughout the course of the investigation.

¶ 7    Several Polish-speaking police officers testified to interpreting for Detective Auguste during his interviews with defendant. During the first four interviews, defendant gave a consistent account that he left Szymon on the couch while he went into the other room to get a clean diaper. Defendant heard a fall and returned to the living room to find Szymon crying on the ground among some plastic or possibly metal toys. Theresa came out of the bathroom to investigate the noise, and defendant told her that Szymon must have fallen off the couch. Theresea drove Szymon to the hospital while defendant followed in a separate car because he would later need to pick up the couple's older son. Defendant could not explain the extent of Szymon's injuries except that Szymon's older brother, who was two years old, "sometimes play[ed] rough" with Szymon and had "sat on [Szymon's] head" two days earlier.

¶ 8    However, after being told that Szymon had extensive bruising and skull fractures on both sides of his head, defendant gave a different account during his fifth interview in March 2010. This time, defendant stated that he was holding Szymon in the kitchen while warming up some milk for him. As defendant was heating up the milk, Szymon moved and fell out of his arms. Defendant called Theresa and told her that Syzmon was unresponsive after falling off the couch. Theresa came home and they took Szymon to the hospital.

¶ 9    Dr. Anna Ignaczewski testified that she had been Szymon's pediatrician since his birth in late 2009. Dr. Ignaczewski saw Szymon for his four-month check-up on February 15, 2010, just two days before the incident. Dr. Ignaczewski testified that Szymon was "very healthy" at that time with no signs of injury. Szymon received two vaccinations via injection and one oral

vaccination at the check-up. Theresa was present for the appointment but did not have to restrain Szymon or hold his mouth open for the vaccinations.

¶ 10    Dr. Ignaczewski further testified that, as of October 2013, Szymon was partially paralyzed on his left side and was "delayed" in his speech development. He wore a special brace on his left hand and had his left leg in a stint as a result of his paralysis. Syzmon was in constant physical and occupational therapy due to his injuries. Dr. Ignaczewski opined that Szymon's permanent disabilities were caused by the injuries he sustained during the incident. Szymon also had cerebral palsy, which could have also resulted from his injuries. Dr. Ignaczewski did not perform any specific tests for cerebral palsy prior to the injuries, but stated that Szymon did not show any signs of the condition beforehand.

¶ 11    Dr. Amanda Fingarson testified as the State's expert in pediatric medicine and child abuse. From her examination of the medical records of Szymon's February 2010 hospitalization, Dr. Fingarson explained that Szymon was admitted to the Intensive Care Unit and placed on a breathing tube and ventilator. He was also having seizures and given anti-seizure medication. CAT scans and MRIs showed a "comminuted skull fracture in the right parietal bone," meaning he had a "more complex, higher energy facture" with "branching" as opposed to a less severe simple linear fracture. Szymon also had a "large subdural hematoma" which is bleeding between his brain and the dura, the "tough outer membrane over the brain." The hematoma "encompass[ed] most of the right side of his brain." Szymon also had subdural bleeding in the "interhemispheric region," or area in between the left and right side of the brain, as well as swelling in the right side of Szymon's brain that "basically pushed the left part of the brain over against the skull." There was also evidence of infarctions and ischemia, meaning tissue death where the blood supply was cut off in certain areas of his brain.

¶ 12    Dr. Fingarson explained that the complex nature of Szymon's fracture was significant because that type of fracture is "typically seen with higher energy events." She stated that the extent of Szymon's head injuries were "not consistent" with a short fall or a fall from any height. According to Dr. Fingarson, accidental falls usually result in either no acute injury or "a simple fracture" with possibly "a small amount of subdural bleeding at the site of the fracture." She testified that she has personally examined over 100 children who had fractures from falls and "[a]lmost all of them were linear." Dr. Fingarson opined that the extent of Szymon's head injuries alone would lead her to conclude that he was the victim of physical abuse.

¶ 13    Aside from the head injuries, Szymon's eyes also showed "multiple intraretinal hemorrhages on the right side that extended to the periphery." Dr. Fingarson explained that this was "a significant finding" because retinal hemorrhages have a "strong association" with abusive trauma. Szymon's retinal hemorrhaging was also "more extensive than you would see with other conditions that can cause retinal hemorrhages." Szymon also had a "few linear marks" on the left side of his face. The linear nature of the marks suggested that they were made with some kind of straight-edged implement, as marks from an accidental fall would be a more irregular pattern.

¶ 14    Dr. Fingarson further identified bruising beneath Szymon's jawbone on both sides, which she said was unusual because it is a "more protected area and difficult to bruise." She opined that it was very unlikely for the bruising to have occurred from holding Szymon's mouth open for an oral vaccine because the bruising was in the wrong location for that and infants Szymon's age readily take oral vaccines. Szymon also had bruising on his buttocks and abdomen, which were unusual areas to receive a bruise because they are protected and "well-padded." Dr. Fingarson testified that Szymon's bruises would not have been caused by the cervical collar he wore at the hospital, even if it was placed on him incorrectly.  Nor were Szymon's bruises and retinal

hemorrhaging consistent with a fall from any height or from "rough housing" with his older brother. Ultimately, Dr. Fingarson concluded to a reasonable degree of medical certainty that Szymon's injuries were the result of physical abuse. She stated that the "totality" of Szymon's injuries "could never, ever, no doubt about it" have occurred from a short accidental fall. Dr. Fingarson would have diagnosed physical abuse from "Szymon's bruising alone *** even if he had no head trauma on presentation."

¶ 15     Finally, Dr. Fingarson testified that she was familiar with the defense's expert, Dr. John Plunkett. She explained that Dr. Plunkett generally believed that "short falls are much more damaging and potentially fatal than most practicians would agree." Dr. Fingarson opined that Dr. Plunkett's views are not widely accepted in the medical community.

¶ 16     For the defense, Maciej testified that earlier on the day of the incident, he, defendant, and Szymon went to the cemetery to visit the grave of a family member. Szymon slept in his car seat in the back seat and did not make any noise during the trip. Maciej did not look at Szymon's face, but saw that defendant checked on him. Defendant was not angry or upset during the outing.

¶ 17     Theresa testified that she went to a local church with a friend on the day of the incident because it was Ash Wednesday. She left church around noon and then went to lunch with her friend. She returned home around 2 p.m. and went straight into the bathroom. While in the bathroom, she heard a noise and then Szymon crying. She exited the bathroom and saw defendant holding Szymon. Szymon "looked like he was falling asleep," so Theresa called the pediatrician but received no answer. She then drove Szymon to the hospital while defendant followed in a separate car. Theresa also acknowledged taking Szymon to the pediatrician a few days before the incident. She testified that she had to hold Szymon's legs for the injections and his chin for the oral vaccine. She did not observe any bruising on Szymon prior to the incident.

¶ 18    Finally, Dr. Plunkett testified for the defense as an expert in child abuse. Dr. Plunkett opined that Szymon's injuries "could" be consistent with a fall from the height of defendant's arms. The injuries also "could" be consistent with a fall from the couch, although that was "less likely but *** still possible." Dr. Plunkett agreed with Dr. Fingarson that Szymon had a fractured skull, subdural hematoma, brain swelling on the right side, and retinal hemorrhaging in the right eye. However, he did not agree that Szymon's fracture was "comminuted" or "complex," instead characterizing it as "a curvy, linear fracture." Dr. Plunkett also opined that the bruising on Szymon's face, ears, and jaw could have come from the cervical collar. Dr. Plunkett attributed Szymon's retinal hemorraging to the "increase in intracranial pressure" caused by brain swelling, rather than a separate injury caused by child abuse. The only injury Dr. Plunkett could not explain was the bruising on Szymon's buttocks.

¶ 19    Following closing arguments, the trial court found defendant guilty of aggravated battery of child but not guilty of attempted murder. In so ruling, the court stated that it found Dr. Fingarson's testimony to be "substantially more credible than" Dr. Plunkett's, particularly because Dr. Plunkett did not offer a credible explanation for Szymon's bruises. The court also discredited Dr. Plunkett's opinion that the cervical collar caused some of Szymon's injuries, opining that the photographic evidence showed the injuries were "clearly inconsistent with the placement of the C-collar." Ultimately, the credible testimony of the State's witnesses "together with the changing nature of [defendant's] story" led the court to "conclude without hesitation" that defendant was guilty of aggravated battery of a child. However, the court found defendant not guilty of attempted murder because there was no evidence the defendant had the specific intent to kill Szymon.

¶ 20    Defendant filed a motion for a new trial, arguing that the evidence was insufficient to find him guilty beyond a reasonable doubt. The trial court denied the motion and sentenced defendant to 14 years in prison. Defendant's motion to reconsider his sentence was denied.

¶ 21    On direct appeal, defendant argued that the State failed to prove him guilty beyond a reasonable doubt where the " 'the trial court's finding of abuse was based solely on its credibility assessment of the testimony of two dueling experts.' " *People v. Dziadkowiec*, 2017 IL App (1sr) 143568, ¶ 20. Defendant also argued that there was insufficient evidence that he intentionally or knowingly caused Szymon great bodily harm. *Id.* This court affirmed defendant's conviction, finding that a rational trier of fact could have found defendant guilty beyond a reasonable doubt based on the expert testimony and his contradictory accounts of how Szymon was injured. *Id.* ¶¶ 23-26. Our supreme court denied defendant's petition for leave to appeal. *People v. Driadkowiec*, 417 Ill. Dec. 839 (2017).

¶ 22    In May 2022, defendant, through counsel, filed a petition for relief under the Act. Defendant's petition raised a claim of actual innocence based on newly discovered evidence in the form of (1) a 2016 study conducted by Dr. Fingarson and (2) a written opinion from Dr. Joseph Scheller mentioning that study. Defendant contended that Dr. Fingarson's study contradicted her trial testimony because it showed that a significant percentage of young children who experienced accidental falls suffered fractures and other intracranial injuries. Defendant contended that Dr. Fingarson's study "undermines the credibility of her expert testimony at trial and reinforces Dr. Plunkett's testimony at trial."

¶ 23    The study, which was attached to defendant's petition, is entitled "Enlarged Subarachnoid Spaces and Intracranial Hemorrhage in Children with Accidental Head Trauma" and was authored by Dr. Fingarson and four others. The stated objective of the study was to examine whether

children with benign external hydrocephalus (BEH), an enlargement of subarachnoid spaces in the brain, are more predisposed to developing subdural hematomas with or without head trauma. The study examined 110 children aged 1 to 24 months who suffered accidental falls from less than six feet. Children who were suspected to be victims of abuse were systematically excluded from the study.

¶ 24    The primary conclusion of the study was that the researchers found no correlation between BEH and subdural hematomas. The study also mentioned that their population "had a higher incidence of [intracranial hemorrhage] and skull fractures than described in other studies of falls from a lower height." However, this finding was "not unexpected" because the researchers identified their subjects through the child abuse team's database and billing codes associated with head injuries. Thus, their methodology would exclude many children who experienced a fall without a resulting head injury. The researchers also acknowledged that caregivers may have given false details about the trauma such that some children with intentionally inflicted injuries might have been erroneously included and some children with accidental injuries may have been erroneously excluded from the sample. Moreover, the overall number of children who had intracranial hemorrhaging was "small," which was "another limitation" on the general applicability of the study's findings.

¶ 25    Also attached to the study was a written opinion from Dr. Scheller, a pediatrician and child neurologist who claimed to have extensive experience in treating children with head injuries. According to Dr. Scheller, Dr. Fingarson's study showed that "infants who suffer short falls do not typically develop life threatening consequences, but this complication does rarely occur." Dr. Scheller also noted that Szymon had bilateral intraretinal hemorrhages, which he attributed to intracranial hemorrhaging and increased intracranial pressure. Dr. Scheller stated that these

symptoms are "not specific to abusive head trauma." Overall, Dr. Scheller opined to a reasonable degree of medical certainty that Szymon "suffered rare but well-known complications from a short fall. There was no evidence that Szymon was a victim of child abuse[.]"

¶ 26    Defendant's petition was advanced to the second stage of postconviction proceedings on May 20, 2022. On July 6, 2023, the State filed a motion to dismiss the petition. The State argued that defendant failed to make a substantial showing of actual innocence because Dr. Fingarson's study is "clearly not conclusive enough to change the result at trial." The State observed that Dr. Fingarson's trial testimony was based on the specific facts of the case, including the injuries to areas other than Szymon's head. The State noted that the study excluded subjects who, like Szymon, showed potential signs of abuse like unexplained bruises. The State further contended that Dr. Scheller's opinion could have been presented at the time of trial, was merely cumulative of Dr. Plunkett's opinion, and not so conclusive that it was likely to change the result of the trial.

¶ 27    The trial court held a hearing on the State's motion to dismiss on October 26, 2024. After hearing arguments from the parties, the court granted the motion and dismissed defendant's petition. The court emphasized that its finding of guilt "wasn't based solely on competing expert witnesses," but also "other injuries beyond those that could have been sustained in some fall[.]" The court opined that the totality of Szymon's injuries "were all indicative of *** a child who was battered in a manner that led to great bodily harm[.]" Ultimately, the court stated that defendant's new evidence "does nothing to raise a substantial showing" of actual innocence.

¶ 28    This appeal followed.

¶ 29                                    II. ANALYSIS

¶ 30    The Act provides a three-stage mechanism by which a criminal defendant may assert that his conviction was the result of a substantial denial of his constitutional rights. *People v. Agee*,

2023 IL 128413, ¶ 36. At the first stage of postconviction proceedings, the circuit court must review the defendant's petition and dismiss it if it is frivolous or patently without merit. *Id.* The petition advances to the second stage if it states an arguable claim of a constitutional violation. *Id.*

¶ 31 At the second stage, the State may file either an answer to the petition or a motion to dismiss. *Id.* ¶ 37. When considering a motion to dismiss, the circuit court must determine whether the petition and accompanying evidence makes a substantial showing of a constitutional violation. *People v. Pingelton*, 2022 IL 127680, ¶ 34. In evaluating whether the petition makes a substantial showing, the court takes as true all factual allegations that are not positively rebutted by the record. *People v. Robinson*, 2020 IL 123849, ¶ 45. The court must refrain from making factual or credibility determinations at this stage. *Id.* If the circuit court determines that the petition makes a substantial showing of a constitutional violation, the court will advance the petition to a third-stage evidentiary hearing. *Pingelton*, 2022 IL 127680, ¶ 34. However, if it does not, the court will dismiss the petition. *Id.*

¶ 32 Where, as here, the defendant raises a claim of actual innocence, he must present evidence that is new, material, noncumulative, and of such a conclusive character that it would probably change the result in a new trial. *People v. Coleman*, 2013 IL 113307, ¶ 96. Evidence is "new" when it could not have been discovered until after trial. *Id.* Material and noncumulative mean that (1) the evidence is relevant and probative of the defendant's innocence, and (2) adds to the evidence that the jury has already heard. *Id.* Finally, evidence is sufficiently conclusive when, considered alongside the trial evidence, would "probably lead to a different result." *Id.*

¶ 33 In this case, defendant contends that his evidence is "new" because Dr. Fingarson's 2016 study did not exist at the time of his 2014 trial. He also maintains that Dr. Scheller's opinion is new because it "must be viewed in tandem" with Dr. Fingarson's study and "explains the relevancy

of the study and how it undermines [Dr.] Fingarson's trial testimony." Defendant further argues that his new evidence is material and noncumulative because it contradicts Dr. Fingarson's trial testimony and establishes that a skull fracture and other intracranial injuries are a rare but possible result of short accidental fall. Finally, defendant maintains that the new evidence is conclusive enough to probably change the result on retrial because it undermines Dr. Fingarson's credibility and demonstrates that "the science may align more closely with [Dr.] Plunkett's opinion" that short falls can be much more damaging that previously believed. Defendant also contends that the cause of Szymon's head injuries goes to the heart of the case because they were necessary to establish the "great bodily harm" element of the most serious charges. He maintains that a third-stage evidentiary hearing is required for the circuit court to make credibility determinations and decide how much weight to give the new evidence.

¶ 34    We agree with defendant that, as it did not exist at the time of trial, Dr. Fingarson's 2016 study qualifies as new evidence. Clearly, the study could not have been discovered before trial with any amount of diligence. However, we disagree that Dr. Scheller's opinion is similarly new. Although defendant insists that Dr. Scheller's opinion "must be read in tandem" with Dr. Fingarson's study and "would have been impossible for the defense to obtain at the time of trial," we note that the opinion only references the study in a single sentence as documenting the "possibility" that an infant may develop life-threatening injuries from a short fall. It is far from clear that Dr. Scheller only came to this opinion because of the 2016 study. Indeed, Dr. Scheller refers to the rare possibility of life-threatening injuries as "well-known."  We also note that this was essentially Dr. Plunkett's opinion, which was obviously available at the time of trial. The other aspects of Dr. Scheller's relatively short opinion, *e.g.* that Szymon's bilateral intraretinal hemorrhages are not necessarily a sign of abuse, have nothing to do with Dr. Fingarson's study.

Thus, we are unconvinced that—aside from a single reference to Dr. Fingarson's study—the defense could not have obtained the substance of Dr. Scheller's opinion earlier.

¶ 35    In any event, defendant's new evidence is also not so conclusive that it would probably change the result in a new trial. The conclusive character of the new evidence is "the most important element of an actual innocence claim." *Robinson*, 2020 IL 123849, ¶ 47. Our supreme court has stated that when determining whether new evidence is sufficiently conclusive to support a claim of actual innocence, the trial court "must consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Coleman*, 2013 IL 113307, ¶ 97. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id.*

¶ 36    As the State points out, the study's main focus was whether infants with BEH were more susceptible to developing subdural hematomas. Defendant concedes that, as there is no evidence that Szymon has BEH, this aspect of the study is not directly applicable to him. Even so, defendant insists that the study remains relevant and conclusive because it shows a rare possibility that fractures and other serious intracranial injuries can result from a short accidental fall.

¶ 37    However, there are several problems with defendant's position. First, the study itself explains that the relatively high percentage of cases involving such injuries was "not unexpected" because the study found its participants via billing codes for head trauma and a database of cases flagged for possible child abuse. The study explicitly recognizes that it may have systematically excluded short accidental falls that did not result in head injuries, or that it may have unwittingly included victims of abuse based on false information from caregivers. The study also states that the small sample size of serious injuries limits its broader applicability.

¶ 38 Moreover, neither Dr. Fingarson's study nor Dr. Scheller's opinion make any mention of complex or comminuted fractures. In that regard, Dr. Fingarson's study is not even inconsistent with her trial testimony, as she explained at trial that short accidental falls could result in simple, linear fractures. However, Dr. Fingarson based her conclusion of abuse in part on the complex and comminuted nature of Szymon's fracture, which she explained would come from a higher impact event than a short accidental fall. Similarly, Dr. Fingarson did *not* testify that subdural hematomas, intraretinal hemorrhaging, and other serious injuries cannot occur from accidental falls. Indeed, she readily admitted that she had personally examined many children who suffered simple linear fractures from accidental falls. Rather, she explained that the magnitude of Szymon's injuries was what led her to conclude that he was abused. For example, Dr. Fingarson testified that Szymon had "*multiple* intraretinal hemorrhages on the right side that *extended to the periphery*." (Emphases added.). She explained that this was "more extensive" than the hemorrhaging that would occur for reasons other than deliberate abuse. Simply put, the 2016 study does not speak to complex fracture or extensive intraretinal hemorrhages. Thus, the study does little to undermine Dr. Fingarson's credibility.

¶ 39 We also observe that, contrary to defendant's suggestion on appeal, Dr. Fingarson explicitly testified that she would have determined that Szymon was the victim of abuse based on his "bruising alone *** even if he had no head trauma on presentation." The record shows that Dr. Fingarson's testimony on the bruising and other non-head injuries, coupled with Dr. Plunkett's inability to explain such injures, was a major reason that the court credited the opinion of Dr. Fingarson over Dr. Plunkett's. Defendant's new evidence does absolutely nothing to undermine Dr. Fingarson's opinion on this point.

¶ 40    Still, defendant insists that we must focus on Szymon's head injuries because they were necessary to establish great bodily harm. See 720 ILCS 5/12-4.3(a) (West 2010) (an adult defendant commits aggravated battery of a child where he intentionally or knowingly causes great bodily harm to child under the age of 13). Even accepting this premise *arguendo*, we reiterate that defendant's new evidence does not undermine Dr. Fingarson's testimony because the extensive nature of Szymon's injuries distinguishes his case from the participants of the study. Additionally, it is undisputed that Szymon was not injured at the time of his pediatrician's visit just two days before the incident. Thus, it is only logical to conclude that his bruising occurred at the same time or in close proximity to his head injuries. It makes little sense to determine that Szymon's bruises were a product of abuse, but not his head injuries. Accordingly, defendant's new evidence does not undermine the trial court's finding that defendant intentionally caused Szymon great bodily harm.

¶ 41    *People v. Domagala*, 2013 IL 113688, which defendant says "provides useful guidance," does not change our conclusion. There, a murder defendant filed a postconviction petition alleging that his trial counsel was ineffective for failing to present evidence that the victim's death was actually the result of gross medical negligence from hospital personnel. *Id.* ¶ 24. Defendant supported his petition with affidavits from two physicians. *Id.* Here, in contrast, there is no allegation that medical negligence caused or contributed to Szymon's injuries. *Domagala* was also not an actual innocence case, so the defendant was not required to prove that his evidence was new or so conclusive that it would likely change the result on retrial. Thus, *Domagala* is entirely distinguishable, and any reliance on that case is misplaced.

¶ 42    Finally, we note that we granted defendant's motion to cite *People v. Petak*, 2024 IL App (5th) 220641-U as additional authority. In *Petak*, the defendant was charged with aggravated

- 15 -

battery for injuries sustained by one of the children who attended the daycare she ran. *Id.* ¶ 4. Prior to trial, the defendant requested a *Frye* hearing on whether retinal hemorrhaging was "a definitive sign of abusive head trauma." *Id.* ¶ 6. The trial court ruled that a *Frye* hearing was unnecessary based on its review of the relevant case law. *Id.* ¶ 10.

¶ 43 On direct appeal, the Fifth District reversed on unrelated grounds, but addressed the defendant's argument that the trial court erred in denying a *Frye* hearing because it was likely to arise again on remand. *Id.* ¶ 41. In particular, the appellate court found that the trial court should have held a *Frye* hearing because the link between retinal hemorrhaging and trauma was neither unequivocal nor undisputed. *Id.* ¶ 45. The court also noted that cases from "other jurisdictions have expressed concern" about the link between retinal hemorrhaging and intentional abuse. *Id.*

¶ 44 According to defendant, *Petak* is relevant because it demonstrates that it is not well-settled that retinal hemorrhaging is a definitive sign of abuse. However, setting aside the fact that *Petak* is an unpublished case from a different district, we find it unpersuasive under the facts of this case. See *Universal Metro Asian Services Ass'n v. Mahmood*, 2021 IL App (1st) 200584, ¶ 14 (decisions of one district of the appellate court are not binding on other districts). As previously explained, Dr. Fingarson's testimony did not rely solely on the presence of Szymon's retinal hemorrhaging. Rather, her opinion was based on the totality of the evidence, including the *extent* of Szymon's retinal hemorrhaging and numerous other serious injuries she found inconsistent with a short fall. Especially when Dr. Fingarson's testimony is combined with other evidence such as defendant's wholly inconsistent statements to the police, *Petak* does not undermine our confidence that defendant's new evidence would not change the result on retrial. Consequently, we find that the trial court did not err in dismissing defendant's postconviction petition at the second stage.

¶ 45                                   III. CONCLUSION

¶ 46    For the reasons stated, we affirm the judgment of the circuit court.

¶ 47    Affirmed.